## In re LAFAYETTE RADIO ELECTRONICS CORPORATION et al., Debtors.

### Bankruptcy No. 880–00042.

United States Bankruptcy Court,
E. D. New York.

March 30, 1981.

---

See also, Bkrtcy., 7 B.R. 187; Bkrtcy., 7 B.R. 189; Bkrtcy., 8 B.R. 528; Bkrtcy., 8 B.R. 973.

Levin & Weintraub, New York City, for debtor.

Leinwand, Maron, Hendler & Krause, New York City, for Arlen Ronbet Corp.

Simon, Sussman, Uncyk, Forsetter & Borenkind, New York City, for Peter Feldman.

Bell, Wolkowitz, Kalnick, Klee, Green & Beckman, New York City, for Joseph Follmer.

C. ALBERT PARENTE, Bankruptcy Judge.

Lafayette Radio Electronics Corporation (hereinafter "debtor") filed an order to show cause on September 23, 1980, seeking permission to assume a real estate lease entered into with Arlen Ronbet Corporation (hereinafter "landlord") pursuant to 11 U.S.C. Section 365(a), and to sublease the premises to Sublime Sales Corporation (hereinafter "Sublime").

The landlord filed its answer to the debtor's request for relief on October 14, 1980, which set forth the following affirmative defenses: (1) the debtor has failed to comply with the requirements of Rule 701(2) of the Rules of Bankruptcy Procedure; (2) the proposed sublease between the debtor and Sublime will result in the creation of a deleterious condition; (3) the proposed sublease will be detrimental to the tenants in the landlord's building; and (4) the proposed sublease will result in the loss of dignity to the premises in question.

On October 16, 1980, the landlord filed an amended answer, which not only reiterated the aforementioned affirmative defenses, but also included the following additional defense: adequate assurance of future performance has not been provided by either the debtor or the subtenant.

The landlord further amended his answer on November 17, 1980, by adding the following affirmative defenses: (1) the debtor is not the real party in interest; (2) the debtor failed to give notice of its request to assume the prime lease to all creditors.

The hearing on the debtor's request for relief was commenced on November 18, 1980, at which time the Court deemed the debtor's order to show cause a complaint and the hearing was conducted as an adversary proceeding. Upon deeming the debtor's order to show cause to be a complaint, the landlord's first affirmative defense was rendered moot and consequently the Court dismissed said defense. Furthermore, the Court at said hearing dismissed the additional affirmative defenses raised by the landlord in its second amended answer dated November 17, 1980, predicated on the landlord's failure to comply with the procedures set forth in Rules 12 and 15 of the Federal Rules of Civil Procedure.

The hearing was concluded on November 19, 1980.

A summary of the pertinent facts elicited at the hearing follows.

(1) Debtor entered into a lease agreement (hereafter "prime lease") with the landlord on February 1, 1978, for the ground floor premises located at 800 Third Avenue, New York City. The term of the lease is ten years with an option to renew for an additional five years.

(2) On January 4, 1980, the debtor filed a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code.

(3) Prior to the filing of the Chapter 11 petition, the debtor was current in all lease obligations. During the pendency of the Chapter 11 proceedings, the debtor has defaulted in its rent, real estate tax and labor rate escalation obligations under the prime lease. Robert Crimmins, Director of Real Estate for the debtor, testified that he has in his possession and is prepared to turn over to the landlord, four checks representing rent payments for the months of October and November, 1980, real estate taxes in the sum of $202.66, and labor rate escalation in the sum of $355.19. Crimmins stated that the debtor has sufficient funds in its bank accounts to cover the four checks.

(4) In furtherance of its efforts to reorganize, the debtor commenced a program of subleasing those retail outlets which had been closed, at rentals in excess of the lease rentals set forth in the prime lease between the various landlords and the debtor.

(5) At present, the debtor's sublease program is generating an annual income to the debtor in the sum of $700,000. Crimmins testified that upon completion of the sublease program, the debtor expects the annual income generated to be approximately $900,000.

(6) As part of the sublease program, the debtor commenced this action seeking the Court's permission to assume the prime lease and sublease the premises to Sublime. Predicated on the sublease agreement, the debtor will realize a net income of $894,792 over the term of the agreement, which represents the difference between the debtor's rent obligation under the prime lease and Sublime's rent obligation under the sublease. However, this rent differential will be reduced by $8,000 per month from October 1, 1980, to the actual date the sublease agreement is approved by this Court.

(7) Peter Feldman is a corporate officer, stockholder, and director of Sublime. Feldman testified that Sublime was formed in September 1980 for the sole purpose of entering into the sublease agreement with the debtor. At present, Sublime has no assets or liabilities, and is not actively engaged in business.

(8) Sublime is one of five subsidiary companies of R.P. McCoy Apparel, the parent corporation. Each of the subsidiaries is separately incorporated and each is operated as independent retail establishments. Feldman is the corporate officer in charge of the business operations, as well as a director in each of the subsidiaries.

(9) The subsidiaries are in the retail business of selling women's clothes and accessories under the tradename "Labels for Less."

(10) Each of the subsidiaries was formed in the same manner as Sublime, i.e., a shell corporation was organized for the sole purpose of entering into a lease.

(11) Feldman testified that all of the subsidiaries are presently operating their retail businesses at a profit and are able to meet their rent obligations under the various leases.

(12) Crimmins testified that the debtor was aware and concerned at the time it was negotiating the sublease agreement with Sublime, that Sublime was a mere shell corporation. Crimmins stated that despite the debtor's concern over the financial status of Sublime, a sublease agreement was entered into because of the following factors: (a) the debtor obtained from Sublime a $10,000 cash security deposit; (b) a $10,000 note by Sublime's principals guaranteeing Sublime's performance under the sublease; (c) the fact that all of the subsidiaries doing business under the tradename "Labels for Less" have been operating at a profit; and (d) the value of the premises in question is worth more under a sublease than the rent the debtor is obligated to pay under the prime lease. Thus, if Sublime defaults under the sublease, the debtor will be in a position to relet the premises at a more favorable rent than that which is set forth in the sublease due to the improvements made to the premises by Sublime and the fact that with the passage of time, the rental value of the premises will increase.

(13) Crimmins testified that Article 51 of the prime lease sets forth four conditions, which, if satisfied, permits the debtor to sublease the premises without the consent of the landlord. Crimmins further stated that said conditions have been fulfilled with respect to the sublease in question.

(14) Palmer Sealy, Vice-President and Real Estate Broker for Cross & Brown Co. (rental and managing agents for the landlord), testified that based on his visit to the premises of two of the subsidiaries doing business under the tradename of "Labels for Less," the proposed business operations of Sublime would be violative of Articles 42, 43, 44, 51, and 64 of the prime lease. Specifically, Sealy testified that at the two premises he visited, pipe racks were used to hold the merchandise and the ceilings were painted a dark color. Sealy further stated at trial that Sublime's mode of business would not only be detrimental to and have a deleterious effect on the landlord's building, but would adversely affect the character of the building.

(15) Sealy did admit under cross-examination that none of the landlord's other tenants have expressed an adverse opinion as to the occupancy of the subject premises by a dress shop, nor was Sealy aware of the quality or brand name of the women's clothes which are sold under the tradename "Labels for Less."

(16) In addition to the affirmative defenses raised by the landlord in its answers, the landlord was concerned with Sublime's right to assign its interest in the premises pursuant to Article 18 of the sublease and Sublime's desire to place signs on the premises in question. Crimmins testified that he advised Feldman that all signs had to comply with the requirements set forth in Article 42 of the prime lease. Crimmins stated that Feldman agreed to comply with said requirements.

(17) With respect to the assignment provisions set forth in the sublease, Crimmins testified that while the sublease permits Sublime to assign its interests under the sublease, Sublime may only do so with the consent of the debtor. Crimmins further testified that the debtor would only give its consent if the proposed assignment complied with the provisions of the prime lease.

The aforementioned findings of fact give rise to the following issues:

(1) Whether the provisions of a sublease and a subtenant's mode of business are germane to the determination of whether a debtor has provided adequate assurance of future performance pursuant to Section 365(b)(1)(C); and

(2) Whether the proposed sublease is in the best interests of the debtor and its creditors.

I.

■ Assumption or rejection of executory contracts or unexpired leases is governed by Section 365 of the Bankruptcy Code. *See In re Luce Industries, Inc.*, 8 B.R. 100, 7 BCD 78 (Bkrtcy.S.D.N.Y.1980). If a trustee, or a Chapter 11 debtor, wishes to assume an executory contract under which there has been a default, he must comply with Section 365(b)(1). *In re Sapolin Paints, Inc.*, 5 B.R. 412 (Bkrtcy.E.D.N.Y. 1980).

Section 365(b)(1) sets forth the following conjunctive tripartite test:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

With respect to subdivision (A) of Section 365(b)(1), the only defaults alleged by the landlord were monetary; to wit, the debt-

or's failure to tender certain post-petition rent, real estate tax, and labor rate escalation payments. Crimmins testified at trial that the debtor was prepared and had sufficient funds in its bank accounts to cure all financial obligations presently in default. The landlord failed to controvert the testimony by Crimmins.

Therefore, the Court finds that the debtor has provided adequate assurance that it will promptly cure the alleged defaults. *See, In re Lafayette Radio Electronics, et al*, 7 B.R. 189, 6 BCD 1334 (Bkrtcy.E.D.N.Y. 1980).

Since the landlord has demonstrated no pecuniary loss arising out of the aforementioned monetary defaults, subdivision (B) of Section 365(b)(1) does not apply in the case at bar. Thus, the only remaining requirement of Section 365(b)(1) which need be considered is that of "adequate assurance of future performance." Section 365(b)(1)(C).

## II.

■ The phrase "adequate assurance of future performance" is new and was not to be found in the Bankruptcy Act. *In re Sapolin Paints, Inc., supra.* While said phrase is not defined in the Bankruptcy Code, the legislative history indicates that the terms "adequate assurance of future performance" are not words of art, but were intended to be given a practical, pragmatic construction. *In re Sapolin Paints, Inc., supra; In re Luce Industries, Inc., supra.*

What constitutes adequate assurance is to be determined by factual conditions. *In re Sapolin Paints, Inc., supra.* The Bankruptcy Code requires only that the lessor be given the performance for which he has contracted. The landlord cannot be granted any greater rights than what the lease provides. *In re Sapolin Paints, Inc., supra; In re Luce Industries, Inc., supra.*

As the premises in question is not located in a shopping center, the special considerations with respect to "adequate assurance of future performance" as set forth in Section 365(b)(3) does not apply to the instant case.

The landlord contends that the debtor has failed to provide it with adequate assurance of future performance in that: (1) the debtor has not provided any assurance that Sublime will be able to perform the financial obligations set forth in the sublease agreement; (2) Sublime's method of conducting business violates the provisions of the prime lease; and (3) provisions of the proposed sublease are violative of the prime lease.

### FINANCIAL STATUS OF SUBLIME

The landlord contends that what the debtor purports to be a sublease is in fact an assignment of the debtor's interest in the prime lease and thus, pursuant to Section 365(f)(2), the debtor must provide adequate assurance of future performance by Sublime under the lease agreement.

In contraposition, the debtor contends that the agreement in question is a sublease. As such, Section 365(k) does not apply and the debtor remains primarily responsible for the financial obligations set forth in the prime lease.

Both parties agree that the viability of Sublime's operation is a relevant factor. What is at issue is the weight to be given by the Court to this factor. Resolution of this issue turns on whether or not the debtor's agreement with Sublime is an assignment or a sublease. If the Court concludes that the agreement is an assignment, then, pursuant to Section 365(f)(2), the Court's primary focus will be on the ability of Sublime to comply with the financial obligations under the agreement. If, on the other hand, the Court finds that the agreement in question is a sublease, then the primary focus will be on the debtor's ability to fulfill the financial obligations under the prime lease.

■ An assignment of a lease is defined as a transaction by which the tenant transfers his entire interest in the demised premises for the unexpired term of the original lease. *Howard Stores Corporation v. Robison Rayon Co.*, 64 Misc.2d 913, 315 N.Y.S.2d 720 (App.Term, 1st Dept. 1970), *aff'd*, 36 A.D.2d 911, 320 N.Y.S.2d 861 (1st Dept. 1971).

An assignment is distinguished from a sublease in that in the latter, the assignor reserves unto itself a reversionary interest in the leasehold estate. *Howard Stores Corp. v. Robison Rayon Co., supra; Clements v. Steinhauer*, 15 A.D.2d 72, 221 N.Y. S.2d 793 (App.Term, 4th Dept. 1961); *Bradley v. General Store Equipment Corporation*, 183 Misc. 199, 51 N.Y.S.2d 420 (Mun. Ct.1944), *aff'd*, 268 A.D. 852, 50 N.Y.S.2d 771 (1st Dept. 1944).

■ Where the term of the purported sublease expires one day prior to the termination of the main lease, a sufficient reversionary interest exists such that the agreement will be deemed a sublease and not an assignment. *WMCA, Inc. v. Blockfront Realty Corp.*, 194 Misc. 932, 67 N.Y.S.2d 867 (N.Y.County 1946), *aff'd*, 272 A.D. 800, 71 N.Y.S.2d 895 (App.Term, 1st Dept. 1947), *appeal denied*, 272 A.D. 873, 72 N.Y.S.2d 679 (1st Dept. 1947).

■ In the case at bar, the prime lease terminates on June 30, 1988, and the five year option term ends on June 30, 1993. The purported sublease terminates on June 29, 1993. As a result, the debtor has not conveyed its entire interest under the prime

lease to Sublime since the debtor's interest in the demised premises will revert to the debtor on June 29, 1993. Therefore, the Court finds that the agreement between the debtor and Sublime constitutes a sublease.

Further support for this conclusion is found in Articles 4 and 6 of the sublease.

Article 6 [1] of the sublease provides that said agreement does not create privity of estate between Sublime and the landlord under the prime lease.

To constitute an assignment, there must be privity of estate between the assignee and the landlord. *Ribner v. Babyatsky*, 103 N.Y.S.2d 599 (Orange County, 1951). Under a sublease agreement, no privity of estate is created between the landlord and the subtenant. *Century Paramount Hotel v. Rock Land Corp.*, 68 Misc.2d 603, 327 N.Y.S.2d 695 (Civ.Ct. 1971).

Thus, Article 6 of the sublease demonstrates that the debtor and Sublime intended to enter into a sublease as opposed to an assignment.

Finally, Article 4 [2] of the sublease provides that the debtor is obligated to pay the

---

1. 6. *NO PRIVITY OF ESTATE.* Nothing contained in this Sublease shall be construed to create privity of estate or of contract between Subtenant and the landlord under the Main Lease.

2. 4. *PERFORMANCE BY SUBLESSOR.* Any obligation of Sublessor which is contained in this Sublease by the incorporation by reference of the provisions of the Main Lease may be observed or performed by Sublessor using reasonable efforts to cause the landlord under the Main Lease to observe and/or perform the same, and Sublessor shall have a reasonable time to enforce its rights to cause such observance or performance. Sublessor shall not be required to furnish, supply or install anything under Articles 4, 9 or Rider Articles 45, 46, 49, 53, or 63 of the Main Lease. Subtenant shall not in any event have any rights in respect of the Subleased Premises greater than Sublessor's rights under the Main Lease, and, notwithstanding any provision to the contrary, as to obligations contained in this Sublease by the incorporation by reference of the provisions of the Main Lease, Sublessor shall not be required to make any payment or perform any obligation, and Sublessor shall have no liability to Subtenant for any matter whatsoever*, except·

for Sublessor's obligation to pay the rent and additional rent due under the Main Lease and for Sublessor's obligation to use reasonable efforts, upon request of Subtenant, to cause the landlord under the Main Lease to observe and/or perform its obligations under the Main Lease. Sublessor shall not be responsible for any failure or interruption, for any reason whatsoever, of the services or facilities that may be appurtenant to or supplied at the building of which the Subleased Premises are a part by the landlord under the Main Lease or otherwise, including, without limitation, heat, air-conditioning, water, elevator service and cleaning service, if any; and no failure to furnish, or interruption, of any such services or facilities shall give rise to any (a) abatement, diminution or reduction of Subtenant's obligations under this Sublease, (b) constructive eviction, whether in whole or in part, or (c) liability on the part of Sublessor.**

\* Under the main lease.
\** Nothing contained herein shall serve to relieve the Sublessor from liability to Subtenant for any loss or damage which Subtenant may suffer by reason of any breach of the Main Lease by Sublessor.

rent and the additional rent due under the main lease.

Section 365(k) of the Bankruptcy Code provides that once the trustee, or debtor, assumes an unexpired lease and assigns said lease to a third party, then the third party becomes fully liable under the lease and the trustee or debtor is relieved of any liability resulting from the breach of said lease after the assignment has been executed. 11 U.S.C. Section 365(k); *In re Pin Oaks Apartments*, 7 B.R. 364, 6 BCD 1396 (Bkrtcy.S.D. Texas 1980).

■ Thus, the fact that the debtor retained its liability to the landlord under the sublease for the rent obligations stated in the prime lease demonstrates that the debtor and Sublime have entered into a sublease arrangement.

■ Predicated on the Court's finding that the agreement between Sublime and the debtor constitutes a sublease, the Court's focus will be on the debtor's ability to provide adequate assurance of future performance of the financial obligations contained in the prime lease.

The debtor proposes three levels of adequate assurance that it can perform the financial obligations under the prime lease; to wit, (1) the income stream generated by the sublease program is sufficient to satisfy the rent obligations under the prime lease; (2) the introduction of Wards Company, Inc. as a probable merger partner; and (3) the viability of the "Labels for Less" operations.

With respect to the debtor's income stream theory, Crimmins testified that the sublease program is presently generating $700,000 in annual income and this figure is projected to increase to $900,000. The landlord's only response is that the $900,000 figure is a mere projection that may or may not occur.

This Court has previously held that the debtor's sublease program, in conjunction with the proposed merger between the debtor and Wards Co., Inc., constitutes sufficient assurance of future performance by the debtor. *In re Lafayette Radio Electronics Corporation, et al, supra.*

Furthermore, the landlord does not dispute debtor's contention that the present level of income generated ($700,000 annually) from the sublease program is sufficient to cover the rent obligations under the main lease if both the debtor and Sublime default.

As to the financial viability of Sublime, the debtor contends that while Sublime presently exists as a shell corporation, the financial record of the other subsidiaries operating under the tradename "Labels for Less," establish a likelihood of business success for Sublime.

The landlord takes the position that Sublime is a mere shell corporation with no business experience and no track record.

Predicated on the evidence adduced at trial, the Court finds that although Sublime is a shell corporation, Sublime has a viable business future. All of the subsidiaries operating under the tradename "Labels for Less" were formed in the same manner as Sublime and each is presently operating at a profit. Furthermore, the operating officer of the subsidiaries will be in charge of Sublime's business operation.

The fact that the sublease in question is valuable to the debtor was not disputed by the landlord. Over the term of the sublease, the debtor will receive a net benefit in the sum of $880,000.

To defray any obligations the debtor may incur in the event of a default by Sublime under the sublease, the debtor has received a $10,000 cash security deposit and a $10,000 promissory note executed by the principals of Sublime guaranteeing Sublime's performance under the sublease. The landlord has failed to demonstrate that such assurances are inadequate when measured against commercial standards.

In sum, the Court finds that the debtor has provided adequate assurance that it can perform in the future the financial obligations set forth in the prime lease.

## SUBLIME'S MODE OF BUSINESS

■ As the debtor proposes to exercise the sublease option under the main lease, the debtor must provide adequate assurance

that the exercise of said option is in compliance with the conditions set forth in Article 51 of the main lease.

The landlord contends that not only is the type of business to be operated by Sublime not in compliance with Article 51, but that Sublime's business is violative of Articles 42, 43, 44, and 64 of the prime lease.

In contraposition, the debtor alleges that the landlord has failed to sustain its burden of proof with respect to this contention.

To resolve this issue requires the Court to examine the relevant provisions of the main lease.

3. 51. Notwithstanding the provisions of Article 11 hereof, subject to the following terms and conditions Tenant may sublet all or any part of the Demised Premises, or license the use of any portion thereof, or assign this Lease, but Tenant shall nevertheless continue to remain liable hereunder:

(a) The proposed subtenant or assignee is engaged in a business and the Premises will be used in a manner which is nondeleterious and the proposed subletting or assignment does not violate any negative covenants as used in any other lease between the Landlord and other Tenants of the building, a list of which restrictive covenants Landlord agrees to furnish to Tenant promptly upon Tenant's written request.

(b) The proposed subtenant or assignee is not then an occupant of any part of the building.

(c) Tenant shall remain fully liable for the payment of the rent and additional rent due and to become due under this Lease and for the performance of all of the terms, covenants and conditions of this Lease on the part of the Tenant to be performed or observed.

(d) That no sublease or assignment shall be made to the Federal, State or Municipal Government or any department or subdivision thereof, or to any restaurant or other business selling food, massage parlor, commercial bank, employment agency, to any proposed sublessee or assignee engaged in the sale of pornographic material which shall be determined in the reasonable discretion of the Landlord or for any other type of use which may be detrimental to the building and its dignity in the reasonable opinion of the Landlord.

Tenant shall, within 30 days after any subletting or assignment, deliver to Landlord a copy of such sublease or assignment. If Tenant assigns this Lease, Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also serve a copy of such notice upon the original Tenant, Lafayette Radio Electronics Operating Corp. or any successor to Lafayette Radio Electronics Operating Corp. (Lafayette Radio Electronics Operat-

The landlord contends that the debtor has failed to satisfy the first condition enumerated in Article 51[3] of the main lease; to wit, the subtenant shall use the demised premises in a manner which is nondeleterious.

■ To determine if Sublime's use of the demised premises conflicts with the first condition in Article 51 requires the Court to consider Article 43[4] of the main lease, which permits the demised premises to be used for the operation of an electronics specialty store and/or for any other lawful

ing Corp. or its successor being herein called the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to the Original Tenant. The Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease. If this Lease terminates because of a default of such assignee after an assignment of this Lease shall have been made, Landlord shall promptly give to the Original Tenant notice thereof, and the Original Tenant shall have the option, exercisable by the giving of notice by the Original Tenant to Landlord within 10 days after receipt by the Original Tenant of Landlord's notice, to cure any default in the payment of rent or additional rent and become Tenant under a new lease for the remainder of the Term upon all of the same terms and conditions as then remain under this Lease, and such new lease shall commence on the date of termination of this Lease, except that if Landlord delivers to the Original Tenant, together with Landlord's notice a release as to all future liability under this Lease, the Original Tenant shall not have the foregoing option.

4. The Demised Premises may be used and occupied for the operation of an electronics specialty store and/or for any other lawful retail purpose. Tenant shall not be obligated to conduct, or to remain open for the conduct or, any business in the Premises. Landlord represents that the present zoning permits the use and occupancy of the Premises for the operation of an electronics specialty store, provided, however, that said premises shall not be used by the Federal, State or municipal governments or any department or subdivision thereof or any restaurant or other business serving food, massage parlor, commercial bank, employment agency, any business engaged in the sale of pornographic material or any other type of business which may be detrimental to the building or lower its dignity in the reasonable opinion of the Landlord.

retail purpose. The sole limitation placed on the use of the premises is that the premises cannot be used by the federal, state, or municipal governments, a restaurant or other business serving food, a massage parlor, commercial bank, employment agency, any business engaged in the sale of pornographic material *or any other type of business which may be detrimental to the building or lower its dignity in the reasonable opinion of the landlord.* (Emphasis added).

■ To determine when a type of business is detrimental to the building or would lower the dignity of the building, as those terms are used in Articles 43 and 51, requires the Court to apply the principle of *ejusdem generis.* Under this rule of construction, where general words follow an enumeration of specific words, the specific words restrict application of the general term to things that are similar to those enumerated. F. McCaffrey, Statutory Construction, at Section 15 (1953); *General Elec. Co. v. Occupational Safety & Health,* 583 F.2d 61 (2nd Cir. 1978).

Therefore, the specific types of businesses enumerated in Article 43 dictate the scope of the general term "any other type of business which may be detrimental to the building or lower its dignity . . . ." The landlord has failed to demonstrate that Sublime's mode of business is in the same category as a massage parlor or a shop selling pornographic material so as to be violative of Article 43. The sole support for the landlord's contention is the fact that at the two "Labels for Less" stores Sealy visited, the women's dresses were sold off a pipe rack and the ceilings were painted a dark color.

However, Sealy stated under cross-examination that he was not aware of the quality or brand name of the dresses sold under the tradename "Labels for Less." Furthermore, Sealy admitted that none of the major tenants in the building have expressed an opinion as to the occupancy of the building by a dress shop.

Finally, it is important to note that the landlord failed to adduce any evidence at trial that the "Labels for Less" stores visited were disorganized or cluttered, that the merchandise sold was of a low quality or that the operations of these stores interfered in any way with the operations of the other tenants in those locations.

In sum, the Court finds that there is insufficient evidence in the record to support the landlord's contention that Sublime's mode of business is violative of Article 43. Therefore, the debtor has complied with the conditions set forth in Article 51 of the main lease.

Article 42[5] provides that the landlord may withhold its approval for the erection of exterior signs if such signs will lower the dignity of the building. No evidence was introduced by the landlord to demonstrate that the signs to be erected by Sublime will in fact lower the dignity of the building. Crimmins testified that he advised Feldman that any signs to be placed on the exterior

---

5. 42. Landlord agrees that Tenant may, at its sole cost and expense, erect exterior signs referring to its operation on the premises provided that all plans, specifications and other details with respect to such signs are first approved in writing by Landlord. Landlord agrees that it will neither unreasonably withhold nor delay such approval. The Landlord may withhold its consent if in its sole opinion such signs will lower the dignity of the building of which the demised premises form a part. Notwithstanding the foregoing, Tenant may, without consent of Landlord, maintain exterior signs equivalent in size and scope to those installed by Franklin National Bank. Tenant shall, however, in all instances remain fully liable for the operation and maintenance of such signs, and for the compliance with all laws, rules and regulations of any governmental authority having jurisdiction thereof. Subject to the above provisions of this Article the Tenant is permitted to install and maintain two exterior illuminated signs: one on Third Avenue and the other on 50th Street. The brightness of the illumination of such signs shall be determined by the Landlord, but such signs shall not in any event be flashing signs and provided further that the Tenant shall not tape advertising signs on to the windows of the demised premises or use loud speakers *in* which the sound shall be directed in the streed (sic). Tenant shall remove any such sign or signs at the expiration or earlier termination of this Lease and shall repair any damage to the premises which may be caused by such removal.

of the building had to comply with Article 42. Not only did Feldman state to Crimmins that his signs will comply with Article 42, but that the signs contemplated for use by Sublime are identical in character to the signs presently used by the debtor.

Article 44 [6] of the prime lease restricts the tenant from making changes, installations, replacements and improvements in the demised premises which would lower the dignity of the building. The record is silent as to what changes, installations, replacements or improvements, if any, Sublime intends to make which would lower the dignity of the demised premises.

Article 64 [7] of the prime lease prohibits the tenant from installing, maintaining or replacing any roof antennae which would adversely affect the physical integrity of the building. No evidence was adduced at trial as to whether Sublime intends in the future to install, replace or maintain a roof antennae on the roof of the demised premises.

Thus, the Court finds that the landlord has failed to sustain its burden of proof that Sublime's mode of business would be detrimental to the demised premises and lower the dignity of the landlord's building.

## TERMS OF SUBLEASE

 The landlord alleges that pursuant to paragraph 18 of the sublease agreement, Sublime is granted the right to sublease or assign its interest in the demised premises without first obtaining the landlord's consent. Therefore, there is a possibility that Sublime may assign or sublease the premises to an entity whose type of business would not be in conformity with the provisions of the main lease.

Crimmins testified at trial that the sublease agreement requires the debtor to approve any proposed assignment or sublease by Sublime. Furthermore, Crimmins stated that the debtor would not give such consent unless the proposed sublease or assignment complies with the provisions of the prime lease.

The Court thus finds that the representations by Crimmins with respect to paragraph 18 of the sublease constitutes adequate assurance that any subleasing or assignment by Sublime will comport with the provisions of the main lease.

Predicated on the foregoing analysis, the Court finds that the debtor has provided adequate assurance of future performance under the prime lease pursuant to Section 365(b)(1)(C).

6. 44. Notwithstanding the provisions of Article 3 hereof: (a) Tenant may provided it shall not lower the dignity of the building without the consent of Landlord and without approval by Landlord of the contractors or mechanics providing that the Tenant shall not permit the commencement or continuation of labor conflicts which may arise as a result of a prosecution of its work under this Article or any other Article of this lease, make changes, decorations, installations, replacements and improvements in and to the demised premises provided they do not affect the structural portions of the exterior treatment of the building of which the demised premises form a part; (b) all trade fixtures and other movable property installed in the demised premises by Tenant shall remain in the property of Tenant and may be removed by Tenant on or before the expiration of the term of this lease, and (c) Landlord will be reasonable in its requirements of insurance under Article 5.

Upon or prior to the execution of this Lease Landlord had reviewed and initialled its approval on the outline plans for Tenant's initial alterations.

7. 64. Provided Tenant shall coordinate its installation with Landlord's reasonable requirements concerning the physical integrity of the building Tenant may, from time to time, install, maintain and/or replace any roof antennae on the roof of the Building and install any feed wiring associated therewith connecting said antennae with the Demised Premises as Tenant deems necessary or desirable subject, however, to the further provisions that: (a) No such installation shall adversely or materially affect the roof or the structural elements of the Building, (b) All feed wiring shall be run in locations concealed from public view, (c) the occupancy of other tenants in the Building shall not be unreasonably disrupted, (d) Tenant shall indemnify Landlord and hold Landlord harmless from any and all claims for injury or property damage arising out of the installation by Tenant of its roof antennae and associated wiring, and (e) upon removal by Tenant of any antennae or associated wiring, Tenant shall repair any damage to the roof or the Building done in connection with such removal.

The sole issue remaining is whether or not the proposed sublease with Sublime should be approved by this Court.

### III.

 Both the debtor and the landlord agree that whether or not the Court should permit the debtor to enter into the proposed sublease turns on whether or not the sublease is in the best interests of creditors and the estate.

The landlord's sole objection is based on the fact that Sublime has no financial background from which this Court can render a determination as to whether or not Sublime can meet the financial obligations set forth in the sublease.

As previously stated, although presently Sublime is a mere shell corporation, there is sufficient evidence in the record to sustain the Court's finding that Sublime has a viable business future. Furthermore, the debtor not only obtained a $10,000 cash security deposit from Sublime, but also obtained a $10,000 note from Sublime's principals guaranteeing Sublime's performance under the sublease.

While the proposed sublease, standing alone, is not essential for the debtor's revitalization, the proposed sublease, in conjunction with the debtor's sublease program, is a vital step on the road to financial recovery. Crimmins testified that the net benefit to the debtor over the term of the sublease is in the sum of $880,000.

The importance of such a benefit is magnified in light of the proposed merger between the debtor and Wards Co., Inc. As noted in a prior decision of this Court, the proposed merger is a vital step toward the debtor proffering a plan of arrangement to its creditors. *In re Lafayette Radio Electronics Corporation, et al, supra.* As a condition precedent to the merger, the debtor's sublease program must reach an income stream level of $825,000 annually. Therefore, the sublease in question is an integral part of the debtor's reorganization plan.

Predicated on the foregoing analysis, the Court finds that the proposed sublease is in the best interests of the debtor and the creditors, and thus should be approved.

*CONCLUSION*

Premised on the aforementioned findings of fact and relevant principles of law, the Court concludes: (1) that the debtor has satisfied the requirements set forth in Section 365(b)(1) and thus is permitted to assume the prime lease; (2) the landlord's affirmative defenses are hereby dismissed on the basis that the landlord has failed to sustain its burden of proof on said defenses; and (3) the proposed sublease is in the best interests of the debtor and creditors.