**In re ALLEN CARPET SHOPS, INC., et al., Debtors.**

**Bankruptcy No. 881–80568–18.**

United States Bankruptcy Court,
E.D. New York.

Dec. 16, 1982.

Levin & Weintraub, New York City, for debtor.

Jerome R. Halperin, P.C., New York City, for landlord & sublessor.

## DECISION

C. ALBERT PARENTE, Bankruptcy Judge.

Allen Carpet Shops, Inc., the above-captioned debtor-in-possession, has moved for approval of a proposed sub-sublease of premises located at 36–60 Main Street, Flushing, New York. Playground Kiddie Shop, Inc. (hereinafter "Landlord"), the corporation from whom the debtor subleases the premises, opposes debtor's application on grounds hereinafter exposited.

### FACTUAL CONTEXT

On February 19, 1981, Allen Carpet Shops, Inc. (hereinafter "Allen" or "debtor") and one of its two wholly owned subsidiaries, Allen Carpet Clearance Center, North Bergen, Inc. (hereinafter "Bergen") filed separate petitions for reorganization under Chapter 11 of the Bankruptcy Code. In accordance with sections 1107 and 1108 of Title 11 of the United States Code, Allen and Bergen automatically continued as debtors-in-possession in the management and operation of their respective businesses and properties. The Chapter 11 proceedings of Allen and Bergen have been consolidated for administrative purposes only.

Prior to the filing of their respective Chapter 11 petitions, the debtors operated approximately fifty retail carpet stores throughout the northeastern part of the United States. As a result of a decreased volume of orders and insufficient working capital to fund operations, Allen eventually closed all of its retail carpet stores.

The debtor has assumed a number of its unexpired leases with the stated objective of assigning or subleasing the same at a profit. Allen expects to remain in business after confirmation of its plan as a real estate company, generating income from subleases entered into with the approval of this court for those of its leases which it has not assigned. For this purpose, the debtor has retained Robert Crimmins, a real estate consultant, to market the leases to its closed stores.

In the present proceeding, Allen seeks to enter into a sub-sublease with D & E Enterprises of 14th Street, Inc. (hereinafter "D & E") for the premises located at 36–60 Main Street, Flushing, New York. The skeletal history of Allen's sublease is as follows:

A. *"Lease"*—On July 19, 1977, Joseph Shamosh and Saul Tawil, owners of the realty in question and sole shareholders, officers and directors of Playground Kiddie Shop, Inc. (hereinafter "Playground") leased the premises to Playground.

B. *"Sublease"*—By sublease dated August 18, 1977, Playground sublet the premises to Allen for the period covering August 23, 1977 through August 22, 1982, with a five year renewal option. On June 25, 1981, with the landlord's consent, this court issued an order permitting the debtor to assume the sublease pursuant to 11 U.S.C. § 365 upon the timely cure of all then-existing defaults. Thereafter, the debtor perfected the assumption by effecting the necessary cure of defaults, and duly exercised its five year renewal option, thereby extending the term of the sublease to August 22, 1987.

C. *"Sub-sublease"*—The proposed sub-subletting of the premises by Allen to D & E Enterprises of 14th Street, Inc., is the subject of the instant proceeding. By application dated September 9, 1982, Allen moved the court for an order fixing notice of a hearing on objections, if any, to the proposed sub-sublease. On September 13, 1982, the court issued an order fixing the last date to file objections as September 28, 1982. With debtor's consent, Landlord was permitted to and did file an affidavit in opposition on September 29, 1982.

The landlord's affidavit propounds four objections to the proposed sub-sublease: (1) The sub-sublease would violate the "use and occupancy" provisions of the August 18, 1977, sublease; (2) The premises are "inappropriate as a location for the retail sale of furniture, home furnishings, and related products"; (3) The debtor and/or its proposed sub-subtenant "have committèd waste in the Premises, by having demolished or removed substantial structural portions of the building, without the prior consent of the Landlord"; and (4) "The proposed Sub-Sublease fails to provide adequate protection of the interest of the Landlord in the Premises."

On October 14, 1982, an evidentiary hearing was held on the objections. The following six witnesses testified at the hearing: (1) Robert Crimmins, debtor's real estate consultant; (2) Arthur Allen, Vice-President of Allen Carpet Shops, Inc.; (3) Ralph Price, real estate broker with Urban Living Real Estate, the brokerage firm that produced the proposed sub-subtenant; (4) Abraham Ashkenazie, President of D & E Enterprises of 14th Street, Inc.; (5) William J. Hannigan, landlord's expert engineer; and (6) Joseph Shamosh, owner by tenancy-in-common of the subject premises, and a principal of Playground, the landlord herein.

## I. BENEFIT TO THE ESTATE

The debtor has filed with the court a proposed plan of reorganization dated March 24, 1982, by the terms of which the debtor will pay a dividend of 2% to the holders of allowed general unsecured claims after the holders of priority claims have been paid in full. The court is informed that the plan will shortly be amended to increase the dividend to holders of unsecured claims to 3%.

The proposed plan is to be funded primarily by the net gain ("rent differential") Allen derives from its sublease portfolio. The debtor's portfolio, if the proposed sub-sublease is included, will consist of ten subleases. The debtor's Vice-President, Arthur Allen, testified at the hearing that the debtor's projections indicate that the proposed sub-sublease, if approved by the court, would comprise approximately 8% of the debtor's entire lease portfolio. (Transcript at 41, as amended.) The aggregate rent differential between the proposed sub-sublease and the debtor's sublease with Playground is approximately $100,000. (Testimony of Crimmins, at 21–22.)

While the proposed sub-subtenant, D & E, is presently a mere shell corporation devoid of assets, its owners are prepared to infuse substantial capital into the company. (Testimony of Ashkenazie, at 63–64.) The proprietor of D & E, Abraham Ashkenazie, owns a related corporation known as D & E Enterprises, Inc. (hereinafter "Enterprises"), which operates three profitable retail furniture stores in New York. (Testimony of Ashkenazie, at 61–64.)

Since the proposed sub-sublease would generate substantial net income, the court finds that it is not only in the best interests of the debtor's estate to enter into the proposed sub-sublease, but it is a vital source of funding for the debtor's plan of reorganization.

## II. LANDLORD'S OBJECTIONS

A. Would D & E's Business Violate Use Clause of Sublease?

The sublease between Playground and the debtor contains the following use clause:

The premises are to be used for any lawful purpose, other than the sale of children's apparel, clothing, toys, juvenile furniture or shoes.

It is not disputed that the proposed sub-subtenant (D & E) would use the premises for the retail sale of furniture. Moreover, the use clause which appears in Article 13 of the proposed sub-sublease in no way proscribes the selling of juvenile furniture. The landlord argues that absent such a prohibition D & E might violate the use restriction of the sublease.

The landlord's concern in this regard is unfounded for at least three reasons. First, the landlord interprets the sub-sublease too narrowly. Article 5 thereof provides as follows:

Subtenant shall not do or permit to be done any act or thing which may constitute a breach or violation of any term, covenant or condition of the Main Lease [the Sublease herein] by the tenant thereunder, whether or not such act or thing is permitted under the provisions of this Sublease.

Thus, the use restrictions of the sublease are in effect incorporated by reference into the sub-sublease.

Second, the proposed sub-subtenant agreed in open court to refrain from selling juvenile furniture. (Testimony of Ashkenazie, at 59.)

Finally, the court will not deny the debtor the right to sublet the premises on the basis of mere speculation as to what the sub-subtenant *might* do in the future. The landlord possesses adequate remedies under its sublease in the event of a breach of the use clause therein.

Although the court finds little merit in landlord's contention that the proposed sub-sublease would violate the use clause of the sublease, there appears to be no reason why the use restrictions should not be expressly stated in the sub-sublease. Accordingly, the court hereby conditions approval of the sub-sublease on proper amendment thereof to accomplish this purpose.

### B. Is the Location Inappropriate for Retail Sale of Furniture?

The second objection asserted by the landlord against the approval of the sub-sublease is that the location in question is inappropriate and undesirable for the retail sale of furniture. In support thereof, the landlord merely demonstrated at the hearing that there are other furniture stores in the area, including Rascal's, a children's apparel and furniture shop owned by Joseph Shamosh and Saul Tawil, the sole shareholders of Playground, the landlord herein. Inasmuch as there has been no showing that the location is so situated as to impair the ability of a furniture retailer such as D & E to compete with neighboring furniture stores, this objection may be summarily dismissed.

### C. Do the Alterations Constitute Waste?

The landlord contends that D & E caused structural alterations to be made in the premises in violation of the express terms of the sublease and in contravention of the New York statutory and common law on the subject of waste.

From the evidence adduced at the hearing, it appears that D & E, without the knowledge of the debtor and without the prior consent of the landlord, removed a total of approximately 2,300 square feet of plasterboard partitions, together with their respective 8 doors, on the second and third floors of the demised premises to increase the area available for retail sales. Damage to the premises existing at or about the time of the hearing, but which is not necessarily attributable to D & E, consists of the following: (1) damaged or missing ceiling tiles; (2) glazings for windows missing; (3) small section of a wooden bannister missing between second and third floors; (4) disconnected radiators; (5) hanging and disconnected electrical wires; (6) wall section cut to accommodate transformer for Allen Carpet sign; (7) sign left on premises; (8) miscellaneous damaged walls; (9) stairwell panelling missing; and (10) crack in concrete floor.

It should be noted at the outset that the landlord's objection to the "damage" to the premises is predicated solely on the theory of voluntary waste. The court therefore has before it the question of whether the

alterations of the premises constitute actionable waste for which the landlord should be able to defeat the proposed sub-sublease, but does not presently face the question of whether the debtor has breached maintenance and repair covenants of the lease. Even if the debtor is in violation of such covenants, the landlord apparently has not taken the necessary steps (*e.g.,* service of a notice to cure) to transform the breach into an actionable default. Thus, absent the commission of waste, there would be no present cause insofar as the condition of the premises is concerned, to deny the debtor its contractual right to sublet the demised premises. *See* Sublease at pp. 6–8.

■ New York common law has long held that a tenant ordinarily possesses the right to make beneficial use of the demised premises, but not the right to undertake acts of ownership. *Agate v. Lowenbein,* 57 N.Y. 604 (1874). In the absence of an agreement to the contrary and provided no serious injury is done to the landlord's reversion, the tenant is free to make such non-structural alterations as his legitimate business purposes, consistent with the contemplated use of the premises, may require. *Rumiche Corp. v. Eisenreich,* 40 N.Y.2d 174, 386 N.Y.S.2d 208, 352 N.E.2d 125 (1976); *Andrews v. Day Button Co.,* 132 N.Y. 348, 30 N.E. 831 (1892); *Agate v. Lowenbein, supra.*

The New York Court of Appeals has held that "[i]t is the impingement upon the ultimate estate of the landlord which is the keynote to the definition of waste." *Rumiche Corp. v. Eisenreich, supra* 40 N.Y.2d at 179, 386 N.Y.S.2d at 211, 352 N.E.2d at 128 (citing Rasch, New York Landlord and Tenant [2nd ed.], § 455). On this basis, it has held that the tenant commits voluntary waste where he, without prior permission from the landlord, causes or permits:

> "[s]uch a change as to affect a vital and substantial portion of the premises, as would change its characteristic appearance, the fundamental purpose of the erection, or the uses contemplated, or a change of such a nature, as would affect the very realty itself—extraordinary in scope and effect, or unusual in expenditure."

*Rumiche Corp. v. Eisenreich, supra* 40 N.Y.2d at 179, 386 N.Y.S.2d at 211, 352 N.E.2d at 128 (quoting *Pross v. Excelsior Cleaning & Dyeing Co.,* 110 Misc. 195, 201, 179 N.Y.S. 176, 179 (Mun.Ct., City of N.Y., 1919)).

Article 8 of the New York Real Property Actions and Proceedings Law (RPAPL) grants a statutory right of action against a tenant who "commits waste upon the real property held by him, without a special and lawful written license so to do; or against such a tenant who lets or grants his estate and still retaining possession thereof commits waste without a like license." N.Y. RPAPL § 801 (McKinney 1979). Section 803 of the RPAPL provides a limited exception to the waste doctrine by allowing life tenants and tenants for years to make alterations which might otherwise amount to waste if the following conditions are met: (1) the proposed alteration is one that a prudent owner would likely make; (2) the proposed alteration, when completed, will not reduce the market value of the reversionary interest; (3) the proposed alteration is not in violation of any agreement or other instrument; (4) the life expectancy of the owner of the estate for life or the unexpired term of the estate for years is not less than five years; (5) that written notice of the proposed alteration be served at least 30 days prior to the commencement thereof; and (6) that security be posted in accordance with section 803(2). N.Y. RPAPL § 803 (McKinney 1979). Since, *inter alia,* the unexpired term of the sublease in question is less than 5 years and the debtor having failed to serve notice of the proposed alterations upon the landlord, pursuant to the above statutory requirements, the court finds section 803 to be inapplicable.

In the present case, the parties have, by the terms of the sublease, contractually agreed as to what alterations the debtor is entitled to effect without prior approval by the landlord. Article 5 of the sublease provides that upon compliance with certain

conditions, which are restated in the appendix herein, the debtor is permitted to make alterations as follows:

Subject to the limitation that *no substantial portion of any buildings on the demised premises shall be demolished or removed by Tenant without the prior consent in writing of Landlord,* and if necessary, of any mortgagee of mortgages to which this lease is subordinate, Tenant may at any time or times during the term, and at its own cost and expense, make any alterations, rebuildings, replacements, changes, additions and improvements in and to the demised premises and to the buildings thereon....[1] (emphasis added)

The landlord maintains that the debtor or D & E caused substantial structural damage to the demised premises by removing the aforesaid partitions, ceiling tiles, radiators and bannister section. Moreover, the landlord alleges that the same was undertaken in violation of the express conditions set forth in Article 5 of the sublease.

The partitions in question were made of plasterboard, extended from floor to ceiling, and were held in place by studs. (Testimony of Ashkenazie, at 55–56; Hannigan, at 72.) They served to section off rooms on the second and third floors of the building, which were never used for anything but storage. (Testimony of Shamosh, at 98–99; Allen at 45.)

▪ The proposed sub-subtenant, in the process of renovating the premises for use as a furniture store, removed the partitions in order to increase the sales floor area. In so doing, it may well have enhanced the value of the premises. However, the issue of waste turns not on whether the alteration renders the premises more valuable, but on whether it impinges upon the landlord's right to receive the premises in substantially the same form and character as when the tenant took possession. *Freehold Investments v. Richstone,* 72 Misc.2d 642, 340 N.Y.S.2d 362 (Sup.Ct., App.Term), *rev'd,* 42 A.D.2d 696, 346 N.Y.S.2d 718, *rev'd,* 34 N.Y.2d 612, 355 N.Y.S.2d 363, 311 N.E.2d 500 (1974) (reinstating order of Ap-

pellate Term); *McDonald v. O'Hara,* 117 Misc. 517, 192 N.Y.S. 545 (Sup.Ct., 1921); *Sigsbee Holding Corp. v. Canavan,* 39 Misc.2d 465, 240 N.Y.S.2d 900 (Civ.Ct., Bronx County 1963).

▪ While D & E's motives may not have been improper since it was apparently acting in furtherance of its legitimate commercial needs, it nevertheless effected a significant transformation in the character of the premises. The New York courts have long held that the removal of partitions without the landlord's consent gives rise to an action in waste. *Agate v. Lowenbein, supra; McDonald v. O'Hara, supra; accord, Sigsbee Holding Corp. v. Canavan, supra; Petrelli v. Kagel,* 37 Misc.2d 246, 235 N.Y.S.2d 383 (Civ.Ct., Bronx County 1962). Moreover, the partitions in question, comprising some 2,300 square feet, constituted a sufficiently "substantial portion" of the building to fall within the proscription of Article 5 of the sublease. The court therefore finds that the removal of the partitions constituted waste and was in violation of the sublease.

▪ In contrast, the court finds that the removal of the ceiling tiles, radiators and bannister section do not amount to waste. It appears that the ceiling tiles were evidently stained and damaged by a leak in the roof of the building. (Testimony of Hannigan, at 85.) Under such circumstances, the debtor would not only have had the right under Article 5 of the sublease to remove and replace the dilapidated ceiling, but may well have had the affirmative duty to do so under its covenant in Article 6 thereof to keep the premises in good repair.

As far as the radiators and bannister in question are concerned, it appears their removal did not amount to structural alterations which would give rise to an action in waste since there is no evidence that the premises would be seriously injured thereby. *See Mandelbaum v. Shell Oil Co.,* 500 F.Supp. 446 (E.D.N.Y.1980) (removal of gasoline tanks owned by tenant); *Lansis v. Meklinsky,* 10 A.D.2d 649, 198 N.Y.S.2d 247 (2d Dept.1960) (replacement of sink and stove); *Parker v. Johnson,* 26 Misc.2d 31,

206 N.Y.S.2d 594 (Mun.Ct., Bronx County 1960) (replacement of refrigerator); *Sigsbee Holding Corp. v. Canavan, supra* (replacement of cabinets). The testimony of landlord's expert, William J. Hannigan, indicated that the radiators in question were lying in the middle of the respective floors and could be reinstalled at a cost of $50 each. (Transcript at 76.) The conditions which landlord described must be viewed in the context of D & E's plan to refurbish the demised building. Presumably both the radiators and bannister section will be restored by D & E prior to completion of its renovations. Mr. Ashkenazie testified at the hearing that D & E would comply with the requirements of the sublease, (Transcript at 60), which would include the covenant to keep the premises in good repair.

Article 5 of the sublease was obviously drafted with the intent of giving the debtor a good deal of discretion in determining how the premises should be arranged. The radiators and bannister comprise a *de minimis* part of the building. Certainly, these changes were not so substantial as to transform the nature or character of the premises. The court therefore finds that apart from the partitions, the debtor or D & E did not alter a "substantial portion" of the building within the meaning of the sublease. In this regard, it is noteworthy that the landlord's post-hearing memorandum of law insofar as it deals with structural alterations focuses exclusively on the removal of the partitions, and makes no mention of the radiators, ceiling tiles or bannister.

### 1. Landlord's Remedy for Waste

Having determined that the removal of the partitions constitutes waste in violation of the express terms of the sublease, the court must next determine the appropriate disposition of this case. Ordinarily, where the tenant makes structural alterations in violation of his lease, the landlord may terminate the lease and evict the tenant. *See Matter of Freehold Investments v. Richstone,* 34 N.Y.2d 612, 355 N.Y.S.2d 363 (1974). Moreover, the promise to restore the premises to their original condition *in futuro* is no defense to an action for waste. *Agate v. Lowenbein, supra,* at 614.

However, whatever remedies landlord may have possessed under its lease in regard to the alterations have been waived. At the hearing, landlord's counsel stated in open court "I am not asking that they [*i.e.,* the debtor and D & E] be removed. I am asking, in a way, that they deal fairly with a valuable asset.... We are asking for nothing other than adequate protection." (Transcript at 112, 114.) The position taken by counsel at the hearing is entirely consistent with the affidavit of his client, Joseph Shamosh, dated September 29, 1982. The primary thrust of that affidavit is that the landlord is entitled under the circumstances to some form of adequate protection of its interest in the realty. The landlord's objections, as characterized by its counsel, are solely "questions of money" (Transcript at 15), and seek the debtor's eviction only in the event the debtor is unable to provide such protection of its interest as the Bankruptcy Code may allow. Thus, the landlord, through its counsel, has conditionally waived its right to terminate the lease upon being accorded adequate protection. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (waiver is "ordinarily an intentional relinquishment or abandonment of a known right or privilege."); *cf. Durand & Co. v. Howard & Co.,* 216 F. 585 (C.C.A.2d Cir.1914) (landlord waived forfeiture of lease where it asked court to require tenant's receiver to elect whether to accept or reject lease).

Although landlord's counsel in his post-hearing memorandum of law seeks to withdraw his offer, he is estopped to do so. The doctrine of estoppel may be invoked "where one party rightfully relies upon the word or deed of another party and in 'so relying, changes his position to his injury.'" *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 76 (S.D.N.Y. 1978) (quoting *Metropolitan Life Ins. Co. v. Childs,* 230 N.Y. 285, 292, 130 N.E. 295, 298 (1921)). Mr. Ashkenazie testified at the hearing that D & E had engaged an engineer to prepare the necessary plans for renovation and to obtain whatever permits

or additions to the certificate of occupancy might be required by applicable law. (Transcript at 56, 60–61.) In reliance on landlord's position taken in open court, D & E is expending time, effort and money to make its proposed improvements comport with legal requirements. The court will not at this stage entertain landlord's retraction of its offer, but will instead delineate the protection it deems adequate to preserve the landlord's interest.

### D.  Adequate Protection

Section 363(e) of the Bankruptcy Code provides as follows:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 363(e).

The landlord claims that under the above-cited section it is entitled to "adequate protection" both as to the restoration of the premises and as to the future performance of the debtor and D & E under the sublease. Thus, the landlord requests that a security deposit in the sum of $23,000 be placed in escrow for these purposes.

In contraposition, the debtor alleges that the landlord does not fall within the intendment of § 363(e), and that even if it did the landlord would merely be entitled to security for the restoration of the partitions.

While § 363(e) is designed primarily to "protect the collateral of secured creditors while debtor or a trustee continues to operate the business," In re Curlew Valley Associates, 14 B.R. 506, 514 n. 13, 5 C.B.C.2d 255, 264 n. 13, 8 B.C.D. 495, 501 n. 13 (Bkrtcy.D.Utah 1981), adequate protection of an "interest in property" under an analogous section of the Code has been construed by a recognized authority to apply "to parties who are not secured creditors, or for that matter, even creditors." 2 Collier on Bankruptcy 362–44 (15th ed. 1982) (interpreting 11 U.S.C. § 362(d)(1)).

The problem with providing "adequate protection" to a landlord under a lease that has already been assumed by a debtor is that the landlord would not ordinarily need to look beyond the lease instrument to find all of the protection to which he is entitled. See In re Lafayette Radio Corp., 9 B.R. 993, 998, 4 C.B.C.2d 200, 227, (Bkrtcy.E.D.N.Y. 1981) ("The landlord cannot be granted any greater rights than what the lease provides."); In re Sapolin Paints, Inc., 5 B.R. 412, 420, 2 C.B.C.2d 854, 863, 6 B.C.D. 776, 780 (Bkrtcy.E.D.N.Y.1980) ("What the Code requires is that the lessor be given the performance for which he has contracted."). However, where, as here, the landlord conditionally waives enforcement of its rights under its lease, the landlord may then have an interest worthy of special protection.

Were the debtor seeking to assign its interest under the sublease to D & E, it would have to provide "adequate assurance" of D & E's future performance, because the debtor would be substituting its financial capability for that of D & E. See 11 U.S.C. § 365(f), (k). However, in a sublease context, which is the case herein, the proposed sublessee's economic condition is of little relevance since the debtor continues to remain primarily liable under the lease. In re Lafayette Radio Electronics, supra at 998, 4 C.B.C.2d at 227. This is true a fortiori where, as here, the lease in question grants the debtor the unqualified right to sublet to whomever it chooses. Under the circumstances of the present case, the court finds that the "adequate protection" required by § 363(e) of the Code is not coextensive with the "adequate assurance of future performance" mandated by § 365(f).

The landlord argues that the debtor is no longer in a strong enough financial position to guarantee payment to the landlord in the event D & E should default in its obligations under the proposed sub-sublease. However, the landlord had ample opportunity to evaluate debtor's financial

position and exact "adequate assurance" of the debtor's future performance at the time the debtor assumed the sublease pursuant to the court's order of August 4, 1981. *See* 11 U.S.C. § 365. In a sublease situation, the court is to evaluate the debtor's ability to perform under its unexpired lease, if at all, at the time of assumption by the debtor. 11 U.S.C. § 365(b). Once the debtor assumes his lease, the landlord must, in the absence of compelling circumstances, such as fraud or overreaching at the time of assumption, ride the tides of the debtor's successes and failures at his peril to the same extent as if the debtor were not in bankruptcy. The "adequate protection" requirement of § 363(e) requires that the landlord receive substantially that to which he is entitled under the lease, *see In re Lafayette Radio, supra; In re Sapolin Paints, supra,* but does not require a debtor who has already assumed his lease to put forth guarantees of financial soundness where they would not otherwise be a prerequisite to subletting outside the bankruptcy forum.

In any event, some measure of assurance of performance under the sublease is provided by Enterprises' willingness to enter into a written guarantee to that effect on behalf of the debtor. (Testimony of Ashkenazie, at 69.)

Landlord's contention that the debtor will be distributing substantially all of its assets under its plan of reorganization, and will thereby be rendered "judgment proof" after confirmation, is belied by the substantial "stream of income" that the debtor will be deriving from its other leaseholds. *See In re Lafayette Radio Electronics Corp.,* 7 B.R. 189, 194, 6 B.C.D. 1334, 1337 (Bkrtcy.E. D.N.Y.1981) ("stream of income" under subleases provides "adequate assurance of future performance"). Approval of the sub-sublease herein would not inhibit the landlord from enforcing its existing contractual rights under the sublease.

In light of the above, the court finds that the landlord's interest would be adequately protected within the meaning of § 363(e) if the debtor were to: (1) refrain from causing or permitting any further renovations until all preconditions imposed by the sublease and applicable law have been satisfied; (2) deposit the sum of $10,000 with the landlord as security for the restoration of the partitions, at the landlord's election, upon termination of the sublease; and (3) cause Enterprises to execute a written guarantee that the premises will in all other respects be restored to their original condition, as contemplated by the terms of the sublease, at or before termination of the sublease.

Upon compliance with all of the conditions delineated hereinabove, and upon modification of the use clause, the debtor's application for approval of the proposed sub-sublease is granted.

Settle Order.

### APPENDIX

*Article 5 of Sublease—*

5. (a) Subject to the limitation that no substantial portion of any buildings on the demised premises shall be demolished or removed by Tenant without the prior consent in writing of Landlord, and if necessary, of any mortgagee or mortgages to which this lease is subordinate, Tenant may at any time or times during the term, and at its own cost and expense, make any alterations, rebuildings, replacements, changes, additions and improvements in and to the demised premises and to the buildings thereon, provided;

(i) If pursuant to the terms of any mortgage to which this lease is subject and subordinate the consent of the mortgagee shall be required to make any such alterations, rebuildings, replacements, changes, alterations and improvements to the demised premises and to the buildings thereon, the prior written consent of the holder of said mortgage shall first be obtained.

(ii) No such alteration shall have the effect of reducing the area of the buildings in existence immediately preceding the commencement of such alteration; or of reducing the per square foot floor load capacity in the buildings as in existence immediately preceding the commencement of such alteration.

(iii) That the same shall be performed in a first class workmanlike manner, and shall not weaken or impair the structural strength of such buildings as shall be on the demised premises at the time for which such buildings may be used.

(iv) That the same shall be made according to plans if required [by] law and specifications therefor which shall be first submitted to and approved in writing by Landlord, and the Landlord agrees not to unreasonably withhold or delay its consent, and if such written consent is not given within fifteen (15) days after said plans and specifications have been submitted to Landlord for approval, it shall be deemed that the Landlord has approved said plans and specifications. If Landlord shall refuse to approve such plans and specifications, Landlord shall state its reasons in writing. In case of Landlord's failure to so approve, the Tenant shall have the right to submit to arbitration as provided for in Article 26, whether such approval was reasonably refused.

(v) That before the commencement of any such work such plans if required by law and specifications shall be filed with and approved by all governmental departments or authorities having jurisdiction, and any public utility company having an interest therein, and all such work shall be done subject to and in accordance with the requirements of law and local regulations, of all governmental departments or authorities having jurisdiction and of such public utility company; and

(vi) That before the commencement of any such work, Tenant shall pay the amount of any increase in premiums on such insurance policies provided for under Article 9(a) on account of endorsements to be made thereon covering the risk during the course of such work, and Tenant shall give to Landlord a surety company performance bond in a company acceptable to Landlord, or cash in an amount equal to the estimated cost of such work, guaranteeing the completion of such work, free and clear of all liens, encumbrances, chattel mortgages and conditional bills of sale, security agreement and title retention agreement, according to said plans and specifications therefor;

(vii) In lieu of the performance bond or other security provided for in the prior subparagraph, Tenant may deliver to Landlord (A) duplicate original of all contracts or agreements for labor, services, materials or supplies in connection with any such alterations, rebuilding, replacement, change, addition or improvement which shall provide that no lien or claim shall thereby be created, or arise or be filed by anyone thereunder upon or against the demised premises, or the building or improvements thereon, or to be erected on the demised premises or an [sic] of the equipment thereof or (B) a written waiver by the architect, engineer, contractor, materialman, mechanic, person or corporation named in such contract or any other person performing work or supplying material or supplies of all right of lien which he or it might otherwise have upon or against the demised premises, or the buildings or improvements to be altered, repaired, improved or constructed, or the interest of Landlord therein.

(b) All buildings, alterations, rebuildings, replacements, changes, additions, improvements, equipment and appurtenances on or in the demised premises at the commencement of the term, and which may be erected, installed or affixed on or in the demised premises during the term, are and shall be deemed to be and immediately become part of the realty and the sole and absolute property of Landlord and shall be deemed to be part of the demised premises, except that all movable trade fixtures (not including equipment, as hereinafter defined) installed by Tenant shall be and remain the property of Tenant.