**In re ROBINSON TRUCK LINE, INC.**

**Bankruptcy No. E84–10194.**

United States Bankruptcy Court,
N.D. Mississippi.

Feb. 28, 1985.

J. Tyson Graham, Graham & Segrest, Columbus, Miss., for Robinson Truck Line.

Howard R. Paul, Paul, Koelz, Wilson & White, Memphis, Tenn., for Teamsters Local 667.

Robert Wells, Young, Scanlon & Sessums, Jackson, Miss., for Central States.

Sanford Denison, Mullinax, Wells, Baab & Cloutman, Dallas, Tex., for Southern Conference of Teamsters.

John W. Crowell, Gholson, Hicks & Nichols, Columbus, Miss., for unsecured creditors committee.

## MEMORANDUM OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

Robinson Truck Line, Inc., is a debtor-in-possession involved generally in interstate trucking activities whose employees are members of the Highway and Local Motor Freight Employees Local Union No. 667, hereinafter referred to as Teamsters Local Union, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, as well as, the Southern Conference of Teamsters. Robinson Truck Line entered into a collective bargaining agreement with the Teamsters Local Union for the period commencing April 1, 1982, and expiring on March 31, 1985. Two phases of the collective bargaining agreement, the Health and Welfare Employee Benefit Plan and the Employee Pension Plan, comprise the sub-

ject matter of this litigation. These plans are serviced through two funds denominated as Central States, Southeast and Southwest Areas Health and Welfare Fund, and Central States, Southeast and Southwest Areas Pension Fund. For purposes of clarification, the two funds will be referred to in this Opinion as Health and Welfare Plan and Pension Plan; the servicing agency will be referred to as Central States. All of the parties concur that Robinson Truck Line, also referred to herein as Debtor, is delinquent in the contributions due to the funds, as set forth in the Proofs of Claim and affidavits filed herein, in the following amounts:

A. Health and Welfare Plan:

| | |
|---|---|
| Pre-petition Arrearage: | $55,161.60 |
| Post-petition Arrearage (effective December 26, 1984): | 28,433.45 |
| Total | $83,595.05 |

B. Pension Plan:

| | |
|---|---|
| Pre-petition Arrearage: | $64,545.63 |
| Post-petition Arrearage (effective December 26, 1984): | 20,835.02 |
| Total | $85,380.65 |

For consideration before the Court are the following requests for relief:

A. Two motions filed by Central States requesting that the arrearages under the two plans be paid fully as administrative expenses, plus attorney's fees, as well as, a demand to require the Debtor to timely pay all future contributions to both plans.

B. A motion filed by the Debtor, Robinson Truck Line, requesting the Court to approve the rejection as an executory contract that part of the collective bargaining agreement applicable only to the Health and Welfare Plan, said rejection to be effective the date of the filing of the bankruptcy petition.

C. An objection filed by Teamsters Local Union No. 667 opposing the rejection by the Debtor of the Health and Welfare Plan, alleging the noncompliance with 11 U.S.C. § 1113.

D. An objection filed by the Southern Conference of Teamsters opposing the rejection by the Debtor of the Health and Welfare Plan, paralleling essentially the allegations of the Teamsters Local Union, as well as, advocating the position that rejection is improper because the Debtor did not bargain in good faith with the union representatives prior to unilaterally terminating the Health and Welfare Plan.

DISCUSSION OF FACTUAL EVIDENCE

The testimony presented at the hearing provided a modest insight as to the events prompting the Debtor's decision to reject the Health and Welfare Plan. This plan, which is essentially a hospitalization and major medical program, including both dental coverage and visual care, required a monthly premium for the eight covered employees in the sum of approximately $2,900.00. The Debtor had fallen substantially in arrears on the payment of the premium contributions for this plan, and on March 16, 1984, through its representatives advised Jimmy Carrington and Howard Thornton, the Teamsters Local Union officers, that it could no longer afford the premium payments, as well as, requested a second or third concession to reduce the hourly wage rate governed by the collective bargaining agreement.

At this meeting, the Debtor's representatives were informed to the effect that since the premium payments were in arrears that Central States and/or the insurance carrier, Amalgamated Insurance, would not honor claims tendered by the Debtor's employees. The current treasurer of the Debtor corporation, Hugh Cooper, who was present at the meeting, testified that he was told that the Health and Welfare Plan coverage was terminated. However, the precise language of this statement was disputed by the union officer, Carrington, who stated that he could have told the Debtor's representatives that the claims would not be paid because of the delinquencies. Cooper also indicated that he had seen a letter transmitted by Central States and/or the insurance carrier to the Debtor's union em-

ployees advising that either the coverage was terminated or that the employees' claims would not be honored. A copy of this letter was not available at the hearing.

There was no dispute in the testimony that the claims have not been honored through the Health and Welfare Plan since the filing of the Debtor's bankruptcy petition. However, through an affidavit submitted subsequent to the hearing, Ray Martell Roberson, a representative of Central States indicated that employee pre-petition claims totaling $966.01, were paid by the carrier after this bankruptcy case was filed. These factors are critical as to whether the claims by Central States for the post-petition premium contributions are allowable.

Cooper testified that the union representatives were advised at the March, 1984, meeting that the Debtor intended to cancel the Health and Welfare Plan, but at the same time, would obtain insurance coverage through another source at less expense. The Debtor did, in fact, obtain alternate coverage at a rate of approximately $1000.00 per month for the union employees. This coverage has saved the Debtor corporation approximately $1900.00 per month, but it does not include the dental or visual care benefits. Although the evidence was somewhat inconclusive, the alternate insurance coverage appears fairly comparable to the coverage provided under the Health and Welfare Plan, other than the two areas of coverage mentioned previously. Cooper indicated that the two union representatives were advised of the differences in the insurance coverage at the meeting but this was disputed by Carrington.

On May 14, 1984, the Debtor advised the Teamsters Local Union by letter that the Chapter 11 bankruptcy case had been filed on May 7, 1984. This letter, introduced as Debtor's Exhibit No. 1, further indicated that the Debtor was unilaterally cancelling certain aspects of the collective bargaining agreement, including particularly the Health and Welfare Plan, as well as, a reduction in wages. The letter added that all other provisions of the collective bargaining agreement would be honored by the Debtor.

Subsequent to the aforementioned letter, a second meeting was held on May 31, 1984, between the Debtor's representatives and the union representatives concerning the financial status of the Debtor. As indicated from the notes taken at this meeting, both the Health and Welfare Plan, as well as, the Pension Plan delinquencies were discussed. Although nothing of substance materialized from the meeting, the Court finds that the union was well aware of this bankruptcy proceeding, as well as, that alternate insurance coverage, providing somewhat lesser benefits, had been obtained by the Debtor for the employees. Following this meeting, there appears to have been only insignificant contact between the Debtor and the union representatives up and until the date of this hearing.

In this Opinion, all references to United States Code sections shall be considered as Title 11 United States Code, unless specifically designated otherwise.

## HEALTH AND WELFARE PLAN DISCUSSED

The Court notes at this juncture that in its proposed plan of reorganization, the Debtor has specifically indicated that it intended to reject the Health and Welfare Plan, which expires on its face March 31, 1985.

As to this Plan, the issues to be decided appear as follows:

A. Whether the Debtor should be prohibited from rejecting the Health and Welfare Plan as an executory contract because of its alleged failure to bargain with the union in good faith.

B. Whether the claims of Central States for post-petition arrearages should be allowed in view of the fact that the Debtor obtained alternate insurance coverage, as well as, because Central States by the fact acknowledged the cancellation of the Plan by its refusal to honor all claims submitted by the union employees, contending that it

was justified in so doing because of the nonpayment of the premium contributions.

C. Should the allowed claim, in whatever amount, be treated as an administrative expense or as a pre-petition priority debt as set forth in 11 U.S.C. § 507(a)(4). (The second alternative presupposes that the Court will permit the Debtor to reject the Health and Welfare Plan as an executory contract with the related indebtedness treated in conformity with the provisions of 11 U.S.C. § 502(g).)

■ As to whether the Debtor should be prohibited from rejecting the Health and Welfare Plan unilaterally, because of the allegations that it did not bargain with the union representatives in good faith, the Court notes that this bankruptcy case was filed on May 7, 1984. That portion of the Bankruptcy Amendments and Federal Judgeship Act of 1984, applicable to collective bargaining agreements, i.e., 11 U.S.C. § 1113, particularly, only applies to bankruptcy cases filed after July 10, 1984, the date of the enactment of the aforementioned legislation. Consequently, since this case was filed prior to July 10, 1984, the actions of the Debtor would be subject to the bargaining standards found in *National Labor Relations Board v. Bildisco and Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482, (1984), pertinent paragraphs are quoted as follows, to-wit:

"We agree with the Court of Appeals below, and with the Court of Appeals for the Eleventh Circuit in a related case, *In re Brada-Miller Freight System, Inc.*, 702 F.2d 890 ([11 Cir.] 1983), that the Bankruptcy Court should permit rejection of a collective-bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract. The standard which we think Congress intended is a higher one than that of the "business judgment" rule, but a lesser one than that embodied in the [*Railway and Airline Clerks v.*] *REA Express* [, 523 F.2d 164 (1975)]

opinion of the Court of Appeals for the Second Circuit." *Id.*, 104 S.Ct. at 1196. (*Brotherhood of Railway and Airline Clerks v. REA Express, Inc.*, 523 F.2d 164 (CA–2), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975) decided under the former Bankruptcy Act three years before 11 U.S.C. § 365(a) was passed by Congress.)

"Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution...." *Id.* at 1196.

"Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that that policy would be served by such action. The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted. Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face." *Id.* at 1197.

"... But while a debtor-in-possession remains obligated to bargain in good faith under NLRA § 8(a)(5) over the terms and conditions of a possible new contract, it is not guilty of an unfair labor practice by unilaterally breaching a collective-bargaining agreement before formal Bankruptcy Court action." *Id.* at 1201.

Reflecting on the factual circumstances in this case, the Court is of the opinion that the Debtor was well within the spirit of *Bildisco* when it unilaterally elected to terminate the Health and Welfare Plan in favor of a more economical alternative. This choice did not deny the Debtor's employees the availability of insurance coverage, it simply trimmed an excessive expenditure in an area that well needed reduction. This Court is of the opinion that a Rolls Royce health insurance program is not essential for a company barely surviving financially. Although prohibiting the rejection of the Health and Welfare Plan would not necessarily bring about the liquidation of the Debtor, the Court finds that the successful rehabilitation of the Debtor, balancing the interest of all the affected parties, would be promoted by rejection, and thus permits same in this case.

■ As to the allowed amount of the Central States claim, the Court is persuaded from the credible evidence that for all practical purposes the Health and Welfare Plan was terminated by Central States prior to the filing of this bankruptcy case because of the non-payment of the pre-petition premiums. As such, the Court finds that Central States is not entitled to a claim for Health and Welfare Plan premiums accruing subsequent to May 7, 1984. However, the Court would permit Central States to add to its claim the sum of $966.01, which was paid by the carrier as a result of pre-petition insurance claims submitted by the Debtor's employees. This conclusion is supported by the fact that all parties were well aware at least by mid-May, 1984, that the Debtor had obtained an alternate insurance plan and had announced its intention to unilaterally reject the Health and Welfare Plan.

■ As set forth hereinabove, the Court has found that Central States is not entitled to payment of its claim for accrued post-petition premium contributions. Even if this were not the case, any claim resulting from the rejection of an executory contract would be treated as a pre-petition claim pursuant to the provisions of 11 U.S.C. § 502(g), which states as follows:

"A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, or 13, of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, *the same as if such claim had arisen before the date of the filing of the petition.*" (emphasis added)

The Health and Welfare Plan claim should be calculated, and *the amount qualifying* should be treated in the plan of reorganization pursuant to 11 U.S.C. § 507(a)(4), which provides as follows:

(4) Fourth, allowed unsecured claims for contributions to employee benefit plans—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

Any part not qualifying to be treated as a priority claim would spill over into the general unsecured debt classification and be treated accordingly.

PENSION PLAN DISCUSSION

As to the Pension Plan, the Court notes that the proposed plan of reorganization states that "all other executory contracts and/or unexpired leases will be assumed", which would include the assumption of the Pension Plan. As set forth hereinabove, the Pension Plan has both pre-petition and post-petition contribution delinquencies

which must be considered by the Debtor if the plan is to be confirmed. The Debtor has proposed to treat the Pension Plan arrearages as a priority claim, payable at the rate of $4,000.00 per month. Since the Debtor desires to assume the Pension Plan, a different twist as to the treatment of this claim comes into play, quite unlike the provisions discussed hereinabove for the rejected Health and Welfare Plan. Two sections, 11 U.S.C. § 365(b)(1)(A) and 11 U.S.C. § 1129(a)(9) are applicable and must be analyzed in order to resolve this conflict. The Court in *In Re: Booth,* 19 B.R. 53 (Bkrtcy. D.Utah—1982) recognized the existence of this conflict. For convenience, the applicable texts of the two sections are set forth as follows:

11 U.S.C. § 365(b)(1):

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 1129(a)(9):

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(3), 507(a)(4), or 507(a)(5) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

(C) with respect to a claim of a kind specified in section 507(a)(6) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

■ Therefore, as to the Pension Plan, the issue becomes whether the Debtor can pay the pre-petition and post-petition delinquencies at the rate of $4,000.00, per month, or must the Debtor cure the total arrearage in cash on the effective date of the Plan. There is no question but that the future contributions due under the Pension Plan should be treated as an allowable administrative expense pursuant to 11 U.S.C. § 503.

On the one hand, 11 U.S.C. § 365(b)(1)(A) provides that the debtor cannot assume an executory contract or unexpired lease unless at the time of assumption it cures the default or provides adequate assurance that it will promptly cure such default. By utilizing § 365, it seems that the debtor can defer payment of the 507(a)(1) and 507(a)(4) claims by providing adequate assurance of prompt cure.

Conversely, if 11 U.S.C. § 1129 is applicable, the debtor would be required to pay the § 507(a)(1) and § 507(a)(4) claims in cash on the effective date of the plan unless the creditor agreed otherwise. Therefore, the issue presented is whether the

requirements of a prompt cure under § 365 serve to override the requirements of immediate payment under 1129(a)(9).

11 U.S.C. § 1123(b)(2) which governs the contents of a plan specifically states that if a debtor wishes to provide for the assumption or rejection of any executory contract or unexpired lease within the context of his plan, he must do so subject to § 365 of Title 11. Thus § 1123(b)(2) incorporates by reference the provisions of § 365.

*Solon Automated Services v. Georgetown*, etc., 22 B.R. 312 (Bkrtcy.S.D.Ohio—1982) dealt with the rejection of an unexpired lease through a plan proposed under Chapter 11. The Court specifically held that the protections afforded by § 365 of the Bankruptcy Code to parties entering into lease arrangements with a debtor may not be circumvented by the use of Chapter 11 proceedings because the provisions of 11 U.S.C. § 365 are incorporated by reference into the substantive terms of the plan.

Likewise, the Court in *In Re: LHD Realty Corp.*, 20 B.R. 717 (Bkrtcy.S.D.Ind.—1982), stated that the Congressional intent in enacting § 365, allowing a trustee with court approval, to either accept or reject an executory contract or lease was to make § 365 the exclusive remedy available to a debtor in an executory lease situation. The Court felt compelled to follow the plain language of § 365 and the mandate of Congress embodied therein.

While it is true that the foregoing cases deal with unexpired leases and not executory contracts, the same principle should apply. If 11 U.S.C. § 365 is the exclusive remedy for debtors faced with an unexpired lease within Chapter 11 proceedings, then it necessarily follows that it should also govern executory contracts within the context of a Chapter 11 plan. After all, 11 U.S.C. § 365 deals with both unexpired leases and executory contracts.

The Bankruptcy Court for the Eastern District of New York has also followed the above logic by holding that if a trustee, or a Chapter 11 debtor, wishes to assume an executory contract under which there has been a default, he must comply with § 365(b)(1). See *In Re: Sapolin Paints, Inc.*, 5 B.R. 412 (Bkrtcy.E.D.N.Y.—1980) and *In Re: Lafayette Radio Electronics Corp.*, 9 B.R. 993 (Bkrtcy.E.D.N.Y.—1981).

At the hearing on this matter, Hugh Cooper, on behalf of the Debtor, testified that the Debtor does not have the available cash or assets that it can convert to cash to pay the § 507(a)(1) and § 507(a)(4) claims unless allowed to do so through installments. He also testified that there is sufficient equity in the Debtor's assets to insure that these priority claims will be paid.

■ It is well established that the time for payment of administrative expenses is wholly within the discretion of the Bankruptcy Court. See *In Re: Kors, Inc.*, 13 B.R. 683 (Bkrtcy.D.Vt.—1981) and *In Re: Callister*, 15 B.R. 521 (Bkrtcy.D.Utah—1981). Having considered the Debtor's circumstances and the cases which speak to this issue, this Court being a Court of equity, is compelled to allow the Debtor herein to follow the mandate of § 365 and provide to the creditor adequate assurance of a prompt cure rather than requiring the immediate cash payment under § 1129(a)(9). This result is more consistent with the underlying tenets of modern bankruptcy law which encourage the rehabilitation of a Chapter 11 entity. To hold otherwise, would be an undue burden on the Debtor and most likely prevent the Debtor from formulating a feasible plan which would be in the best interest of all creditors involved.

In this case, a certain part of the pre-petition arrearage in the contributions to the Pension Plan could be classified as a § 507(a)(4) priority in the same manner as the arrearage in the premium payments relative to the Health and Welfare Plan. As set forth hereinabove, the post-petition arrearage in the Pension Plan contributions should be classified as an administrative expense as contemplated in 11 U.S.C. § 503. Other than assisting the Debtor in calculating the amount of the Health and Welfare Plan pre-petition claim that should be treated in the priority classification,

there is no absolute necessity to classify the Pension Plan arrearage as a priority claim or an administrative expense claim since the Debtor is being permitted to utilize § 365(b)(1)(A), as opposed to the more rigorous requirements of § 1129(a)(9). The Court must render a decision as to whether the plan of reorganization provides adequate assurance that the Debtor will promptly cure the default existing in the Pension Plan contract. Since the Debtor will be required to amend his plan as a result of the decision rendered in this proceeding, the Court will reserve its decision on this particular point for a subsequent hearing.

An Order will be entered consistent with this Opinion.