**In re GREAT NORTHWEST RECREATION CENTER, INC., Debtor.**

**Bankruptcy No. 86–40468.**

United States Bankruptcy Court, D. Montana.

June 8, 1987.

Charles W. Hingle, Billings, Mont., for debtor.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

The Debtor's Amended Plan of Reorganization was heard on March 24, 1987, together with three modifications to the Plan. Objections to the Plan were filed by ITT Commercial Finance Corp. (ITT) and Yamaha Motors Corporation, USA (Yamaha). Ballots filed with the Clerk are as follows:

| Class | Creditor | | Amount | Vote |
|-------|----------|--|--------|------|
| 3.03–Priority | Montana Dept. of Revenue | | $ 896.60 | Accepts |
| 4.01–(A)–Secured | ITT | $49,661.00 and | $177,258.00[1] | Rejects |
| 4.02–(B)–Secured | SBA | | 29,812.00 | Accepts |
| 4.03–(C)–Secured | First Bank West Billings | | 39,837.00 | Accepts · |
| 4.04–(D)–Secured | Borg-Warner | | 40,746.49 | Accepts |
| 4.05–(E)–Secured | Yamaha | | 9,653.00 | Rejects |
| 4.06–(F)–Unsecured | Recreational Sports Inc. | | 71,404.00 | Accepts |
| 4.08 and 4.09 | Modern Industrial | | 703.18 | Accepts |
| Unsecured | Keith Markegard | | 10,000.00 | Accepts |
| | Masek Sports Division | | 8,682.64 | Accepts |
| | Owen Curtis | | 6,149.50 | Accepts |
| | Coast to Coast Hardware | | 459.29 | Accepts |
| | Montana Power Company | | 766.00 | Rejects |
| 4.10–(I) | Safeco Insurance | | No amount | Accepts |

Under the Plan, Classes B, C, D and F are impaired. Classes B, C, D and F voted in favor of the Plan, thus satisfying Section 1129(A)(10), which requires at least one impaired class affirmatively vote in favor of the Plan. *In re Douglas Hereford Ranch, Inc., et al.,* 76 B.R. 781, 783–84, 4 Mont.B.R. 162, 164–65 (Bankr.Mont.1987). Class E creditor, Yamaha, may also be impaired under the Plan since it has a contingent liability on any losses sustained by ITT, and thus its legal rights could be changed under the Plan. *In re Acequia,* 787 F.2d 1352, 1363–64 (9th Cir.1986); *In re VZ Ranch,* 69 B.R. 577, 578, 4 Mont.B.R. 69 (Bankr.Mont.1987).

The Debtor is a retail distributor of motorcycles, snowmobiles, four wheelers, chainsaws, generators, and car stereos with accessories. It maintains a parts and service repair business in conjunction with its retail business in Billings, Montana.

The Debtor began business January 1, 1972, and since that time has acquired three of the top five motorcycle franchises: Yamaha, Suzuki and BMW. It sells and services Yamaha snowmobiles and generators and Stihl chainsaws.

The Debtor moved to its present location in 1976 when it purchased a Suzuki dealer, BMW was added in 1981, and in 1983 Debtor purchased the other Yamaha dealer (Recreation Sports) in Billings.

Debtor's staff has received numerous awards over the years, including Super-Service dealer award from Suzuki for the last six (6) years in a row, which is awarded to only the top service dealers out of the 1,600 dealer network. Debtor was also the top selling Suzuki dealer for the year 1985 in its five-state district, and was featured in the Suzuki News Magazine, which comes out twice yearly, as one of the top dealers in the United States. Debtor also was given the Yamaha Pacesetter award for outstanding sales, service and parts sales in 1985. The president of the Debtor has also won acclaim from the industry and received a prestigious award in being elected to the advisory boards of Yamaha and BMW.

A summary of Debtor's operations shows the following:

Year Ended September 30,
(Newest Thousand)

| | 1986 | 1985 | 1984 | 1983 | 1982 | 1981 |
|---|------|------|------|------|------|------|
| Gross Sales | 943 | 1,464 | 1,603 | 1,297 | 894 | 1,184 |
| Cost of Sales | 747 | 1,176 | 1,233 | 1,050 | 705 | 929 |

1. The present amount of the debt is $83,710.00.

| | 1986 | 1985 | 1984 | 1983 | 1982 | 1981 |
|---|---|---|---|---|---|---|
| Gross Profit | 196 | 288 | 370 | 247 | 189 | 255 |
| Shop Service | 65 | 83 | 72 | 68 | 64 | 72 |
| | 261 | 371 | 442 | 315 | 253 | 327 |
| Direct Costs | 190 | 243 | 229 | 184 | 148 | 200 |
| Admin. & Other | 120 | 156 | 139 | 113 | 100 | 84 |
| Officer Sal. | 12 | 41 | 31 | 22 | 12 | 18 |
| Net Operating Profit (Loss) | (61) | (69) | 43 | (4) | (7) | 25 |
| Other Income (Expense) | (6) | (9) | (31) | (3) | —— | 2 |
| Net Earnings (Loss) | (67) | (68) | 12 | (7) | (7) | 27 |

It is noteworthy that gross sales from 1985 to 1986 declined by $500,000.00.

Debtor's customer base is divided into three categories: Agricultural, Industrial and Recreational sales. Each category has contributed to Debtor's financial reversal in the past two years.

1. Agricultural Sales—Because of the severe drought in Montana and Wyoming sales area during 1984 and the first six months of 1985, Debtor has lost 90% of its sales to the farmers and ranchers, who purchase four-wheelers, irrigation motorcycles, and snowmobiles. Debtor began feeling the effects of such decline in agricultural sales starting in the summer of 1985.

2. Industrial Sales—At the beginning of 1985, Debtor had twenty-eight (28) commercial accounts buying four-wheelers and supplies. Twenty-six (26) of these accounts were related to the oil and energy related business—from Continental Pipe Line to survey companies. Again, in 1985, Debtor experiences the impact of energy-related downturn resulting in being left with only two commercial accounts.

3. Recreational Sales—The trickle-down economic effect from agriculture and energy, combined with the slow-down in the housing and commercial construction impacted Debtor's recreational sales starting in the fall of 1985—a period of normally high sales for hunting.

As a result of general economic adversity, Debtor closed one location in September of 1985 and moved all the inventory to one main store. While Debtor terminated five people and cut all expenses for the coming fiscal year by forty percent (40%), it could not cut expenses fast enough. Store liability insurance, worker's compensation, and unemployment insurance doubled even though Debtor's sales were sixty-five percent (65%) of what they were in fiscal year 1985.

Winter sales of 1985–86 were very poor for snowmobiles. With no farm and ranch sales and the lack of snowfall for recreational users, sales were sixty percent (60%) below normal. During the winter of 1985, one of the corporation vehicles was sold and the president of the company took no salary for four months.

Debtor hoped for an early spring and strong recreational sales to alleviate its financial problems, and while early warm spring came, the recreational sales did not improve. The market is very competitive, and while the Debtor fared well in sales compared to its competitors, the overall market had dissipated to such degree that expenses continued to exceed income. For example, the district sales manager of Yamaha testified motorcycle sales in Mon-

tana and Wyoming were 27% off normal sales. During this time, Debtor sought relief from its franchisors on interest payments which were costing debtor around $5,000.00 per month. Normally, interest is very low by summer's end but, with the lack of sales, interest expense was not reduced. The motorcycle companies failed to respond to any relief for the hard hit Pacific Northwest dealers because other area dealers in the United States were not having similar problems, so that the manufacturers did not want to set a precedent to reduce interest rates in one area of the country, while maintaining higher rates in other areas.

On August 8, 1986, the Debtor sought relief under Chapter 11 of the Bankruptcy Code. At this time, Debtor ranked third in sales out of 27 dealers in the Debtor's trade area.

After filing for Chapter 11 relief, Debtor restructured its business operations by diversifying into automotive sound stereo systems, cruise controls, C.B.s, and alarm systems. Billings was in need of a firm that specialized in car stereos and installation. Debtor further reduced its motorcycle staff and replaced these personnel with highly qualified stereo employees. In the first thirty (30) days of operation, Debtor secured stereo installations for K–Mart, Sears, Target, Montgomery Ward, and Radio Shack, and was selling car stereo systems and cruise controls with installations for six automotive dealerships.

Debtor's present management is intact, as is its key personnel. It has engaged in an aggressive advertising mode, and has an excellent business location, which consists of a 10,000 square foot building, on one of the heaviest traffic streets in Montana.

Debtor values its present assets as follows:

| | | |
|---|---|---|
| Automobiles and vehicles | - | $ 10,798.40 |
| Office equipment and supplies | - | 6,192.36 |
| Machinery and equipment | - | 8,127.84 |
| Inventory | - | 650,236.95 |
| Leasehold improvements | - | 5,967.15 |
| Insurance policy cash value | - | 1,600.00 |
| Total | | $682,422.70 |

Against these assets, the Debtor has the following debts:

| | | |
|---|---|---|
| Secured claims | - | $688,822.96 |
| Unsecured claims | - | 111,523.31 |
| Total | | $800,346.27 |

The Debtor's projection of future income and expenses is as follows:

| Year (ending 9/30) | Gross Sales | Net Earnings After Taxes |
|---|---|---|
| 1987 | $1,044,090.00 | $33,621.00 |
| 1988 | 1,067,120.00 | 28,176.00 |
| 1989 | 1,090,674.00 | 31,658.00 |
| 1990 | 1,114,767.00 | 31,156.00 |
| 1991 | 1,139,409.00 | 30,192.00 |
| 1992 | 1,164,615.00 | 28,043.00 |
| 1993 | 1,190,397.00 | 28,210.00 |
| 1994 | 1,216,170.00 | 28,366.00 |
| 1995 | 1,243,747.00 | 28,535.00 |
| 1996 | 1,271,342.00 | 28,718.00 |
| 1997 | 1,299,572.00 | 28,887.00 |

Included in expense items are charges for interest, taxes, wages, freight, advertising and administrative costs. From the Debtor's cash flow payment of each class of creditors is proposed to be made in the following manner:

| Class | Description and Repayment Schedule |
|---|---|
| Priority (3.03) | Internal Revenue Service debt for payroll taxes to be repaid beginning April 1, 1987, including interest at 9½% per annum: |

| Date Incurred | Total Debt | Number Months | Monthly Payment |
|---|---|---|---|
| 12/31/84 | $1,023.00 | 44 | $ 27.63 |
| 3/31/85 | 4,192.00 | 48 | 105.31 |
| 6/30/86 | 2,891.00 | 62 | 59.18 |

| Class | Description and Repayment Schedule |
|---|---|
| Class A–4.01 | ITT debt of $83,710.00 to be repaid over fifteen (15) year period beginning April 1, 1987, at $874.12 per month, including interest at 9½% per annum. |

| Class | Description and Repayment Schedule |
|---|---|
| Class B–4.02 | Western Bank (Small Business Administration) debt of $27,909.00 to be repaid over ten (10) year period beginning April 1, 1987, at $361.14 per month, including interest at 9½% per annum. |
| Class C–4.03 | First Bank-West (auto contract) debt of $5,838.00 to be repaid over 20 month period beginning October, 1986, at $342.00 including interest at 13.2% per annum. Automobile held as collateral on contract. |
| Class F–4.06 | Recreational Sports debt (after proposed intangible asset adjustment) of $55,000.00 to be repaid over fifty-six (56) month period beginning March 1, 1987, at $1,222.00 per month, including interest at 9½% per annum. |
| Class G–4.07 | Unsecured debt of $58,869.00 to be repaid over fifteen (15) year period with annual payments beginning August 1, 1987, at an aggregate payment of $3,925.00 per annum. |
| Class H–4.08 | Unsecured debt of $940.00 (unsecured creditors with less than $500.00 balances) to be repaid in full by August 1, 1987. |
| Class E | Yamaha—paid in full upon confirmation in sum of $9,879.50 or less. |

The Debtor has proposed to pay ITT in full with interest at 9½% per annum, which is a market rate presently established in the Billings area available for the type and term of loan of ITT. In addition, ITT, as well as all other secured creditors, will retain a security interest in the collateral of the Debtor which has a present value equal to the amount of each claim as of the effective date of the Plan, thereby satisfying Section 1129(b)(2)(A)(i)(I). Each secured creditor will also receive on account of its claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of the claimholder's interest in the collateral which secures the debt. 1129(b)(2)(A)(i)(II); *In re Martin,* 66 B.R. 921 (Bankr.Mont.1986).

Schedule A–2 of the Petition and the Disclosure Statement filed with the Plan are in some conflict. BMW of North America, Inc., Sierra Motorcycle Products and Suzuki are listed as secured creditors on Schedule A–2, but none of these creditors are provided for in the Plan. While the file does not reflect that any of those creditors were paid during the course of administration of this estate, the Debtor has been paying secured creditors, and it is likely such creditors have been satisfied. Moreover, each creditor received notice of the confirmation hearing and a copy of the Plan, and none filed any objections so, the Court concludes such creditor has been paid from normal operations. The total amount of the three claims was $7,149.89, which is not significant to impact the Plan.

From the cash flow analysis of the Debtor after payment to the creditors as proposed in the Plan, the Debtor will have a positive cash balance to carry forward for the ensuing year of operation. None of the creditors have challenged the cash flow projections.

ITT and Yamaha oppose the Plan and have filed objections which deal with the feasibility of the Plan and the assumption of the Yamaha executory franchise agreement. Yamaha contends the Debtor's Plan fails to cure existing defaults of the franchise agreement and provide the adequate assurance of continued performance. Debtor claims the franchise agreement is not in default, and Debtor is paying Yamaha on a cash-on-delivery (COD) basis for all merchandise. Such COD operation leads ITT and Yamaha to challenge the feasibility of the Plan with their contention that the Debtor, to stay in business, needs

a floor line of credit to purchase merchandise over the long term and cannot realistically depend on purchases by COD. The issues of feasibility and assumption of the franchise agreements are interwoven since they relate to the adequacy of the Debtor's capital structure and thus are treated together in this opinion.

■ Feasibility is required under 1129(a), which requires that confirmation is not likely to be followed by liquidation or need for further reorganization. This Court held *In re Roberts Rocky Mountain Equipment Company*, 76 B.R. 784, 789–90, 4 Mont.B.R. 230, 238–39 (Bankr. Mont.1987), quoting from *In re Martin*, 66 B.R. 921 (Bankr.Mont.1986), on the issue of feasibility:

" * * * certain principles dealing with confirmation of a Chapter 11 Plan of Reorganization should be restated. I quote from *In re Martin*, supra, at 925–26:

'Certain principles dealing with confirmation of a Chapter 11 Plan are well established. Regardless of whether a valid objection to confirmation has been asserted, the Code imposes upon the Court the responsibility and duty to determine whether the requirements of Section 1129(a) have been met. As stated in *In Re Holthoff*, 58 B.R. 216, 218 (Bankr.E.D.Ark.1985):

"In addition to the consideration of objections raised by creditors, the Court has a mandatory independent duty to determine whether the Plan has met all of the requirements necessary for confirmation. *In re Coastal Equities, Inc.*, 33 B.R. 898 (Bankr.S.D. Cal.1983); *In re White*, 41 B.R. 227 (Bankr.M.D.Tenn.1984); *Matter of Nikron, Inc.*, 27 B.R. 773 (Bankr.E.D. Mich.1983)."

Further as held in *In re Prudential Energy*, 58 B.R. 857, 862 (Bankr.S.D. N.Y.1986):

"[D]ischarging this responsibility does not entail investigation of the Debtor. But it does require the Court to require sufficient documentation to be submitted and to ask appropriate

questions concerning the requirements of Section 1129(a)."

Clearly then, confirmation may not be allowed without full satisfaction of each of the requirements of Section 1129(a) and (b), and on this issue, the Debtors have the burden of proof. *In re Prudential Energy, Id.* at 862.

\* \* \* \* \* \*

The Plan must be feasible, that is, confirmation of the Plan under Section 1129(a)(11) is not likely to be followed by liquidation or the need for further reorganization of the Debtors. *In re Prudential Energy*, supra, holds at 862–63:

"Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under 1129(a)(11). Most Debtors emerge from reorganization with a significant handicap. But a plan based on impractical or visionary expectations cannot be confirmed. (Citing cases and authority). All that is required is that there be a reasonable assurance of commercial viability. *In re Trail's End Lodge*, 54 B.R. [898] at 904 [Bankr.Vt.1985]."

Further, *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985), states:

" * * * The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. *In re Bergman*, 585 F.2d 1171, 1179 (2nd Cir. 1978) (quoting 9 *Collier on Bankruptcy* at 1139). Pertinent factors to be considered include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In re Great Northern Protective Services, Inc.*, 19 B.R. 802, 803 (Bankr.W.D.Wash. 1982)."

■ On the issue of assumption of each franchise agreement, the parties are in agreement that such agreements are executory contracts as that term is used in

Section 365 of the Code. Under Section 1123 of the Code, it is provided:

"(b) Subject to subsection (a) of this section, a plan may—

\* \* \* \* \* \*

(2) subject to Section 365 of this title, provide for the assumption, rejection or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section."

The franchise agreement at issue here has not been previously rejected, and the Plan now seeks to assume that agreement in order to make the Plan feasible. 5 *Collier on Bankruptcy*, ¶ 1123.02, P. 1123–18 (15th Ed.) explains:

"What is clear is that Section 1123(b)(2) does not provide blanket authority to reject or assume executory contracts. Section 1123 (b)(2) is subject to Section 365 and the Trustee's power under Section 365(a) to reject executory contracts and unexpired leases is not absolute but is 'subject to the court's approval'. Thus, what the Plan proposes with respect to assumption, assignment or rejection of executory contracts is not necessarily what the court will determine to be permissible.

Section 1123(b)(2) is permissive. The Plan *may* provide for the assumption or assignment of an executory contract. On the other hand, the contract may 'ride through' the plan as unaffected. However, a party to the contract may insist that it either be rejected or fully assumed under the plan if the contract has not already been dealt with. \* \* \* \*"

*In re Robinson Truck Line, Inc.*, 47 B.R. 631, 12 C.B.C.2d 534 (Bankr.N.D.Miss. 1985), held that since Section 1123(b)(2) governs the contents of a Plan and incorporates by reference provisions of Section 365, the requirement of prompt cure under Section 365 supersedes the requirements of immediate payments under Section 1129(a)(9). See also, *In re Sapolin Paints, Inc.*, 5 B.R. 412 (Bankr.E.D.N.Y.1980). Thus, for a debtor to assume an executory

contract in the Plan, it must comply with Section 365(b)(1).

Section 365(b)(1) states:

"If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the Trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease."

The criteria for assumption of an executory contract together with the meaning of adequate assurance as that term is used in Section 365(b)(1)(A) is spelled out in *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309–1310 (5th Cir.1985):

"It is well established that 'the question whether a lease should be rejected—is one of business judgment'. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific RR Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943). See also *Matter of Minges*, 602 F.2d 38, 42–43 (2nd Cir.1979). 'As long as assumption of a lease [executory contract] appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code—'. *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr.S.D.Ohio 1982).

\* \* \* \* \* \*

Similarly, the parties do not dispute that 11 U.S.C. Section 365(b)(C) requires a debtor-in-possession to provide adequate assurance of future performance when it

assumes a lease. Nor do they dispute the legal standard for determining adequate assurance. * * * Courts have consistently determined whether a debtor offered adequate assurance of future performance by considering whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry and the presence of a guarantee. (Citing cases).

Section 365 is intended to provide a means whereby a debtor can force another party to an executory contract to continue to perform under the contract if (1) the debtor can provide adequate assurance that it, too, will continue to perform, and if (2) the debtor can cure any defaults in its past performance. The provision provides a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so. The section thus serves the purpose of making the debtor's rehabilitation more likely.

In this context, it becomes clear that in the typical case under Section 365, if anyone objects to the debtor's assumption of the contract it will be the other party to the executory contract, not the debtor's creditors who are strangers to the transaction. Thus, the oft-repeated statement that the debtor must accept the contract as a whole means only that the debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement. See In re Holland Enterprises, Inc., 25 B.R. 301 (Bankr. E.D.N.C.1982); In re LHD Realty Corp., 20 B.R. 717 (Bankr.S.D.Ind. 1982). Similarly, the other party cannot hold out for concessions from the debtor beyond those required to provide adequate assurance. See In re Lafayette Radio Electronics Corp., 9 B.R. 993, 998 (E.D.N.Y.1981)."

Thus, we must find, if the executory contract is in default, whether the Debtor's assumption of the contracts is based on its business judgment and whether adequate assurance of future performance is present. In that regard, In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr.S.D. N.Y.1985) teaches that the term adequate assurance of future performance, not defined in the Code, "was intended to be given practical pragmatic construction in light of the facts of each case".

Unlike many cases cited above which deal with the cure aspects of Section 365 by reason of delinquent or default in payments due under the contract, the Debtor in this case is not in default in payments to Yamaha, and Yamaha does not so contend. Rather, Yamaha states in its Brief that its "primary concerns regarding continuation of this dealership, * * * relate to ¶ 2.01 of the agreement requiring a dealter to vigorously promote and sell Yamaha's product at retail; to ¶ 2.04 which requires a dealer to maintain a reasonable inventory of Yamaha products adequate to meet the demand in the market area; and to ¶ 5.05 requiring the dealer to maintain adequate working capital and lines of wholesale credit to enable a dealer to fulfill his responsibilities under the dealership's agreements."

As to the working capital contention, Yamaha and ITT dovetail their agreement on this issue to a requirement of the test on feasibility of the Plan. All parties cite on the feasibility issue In re Martin, supra. To repeat, Martin holds:

" 'Pertinent factors to be considered include the business' earning power, the sufficiency of the capital structure, economic conditions, management efficiency, and whether the same management will continue to operate the company. In re Great Northern Protective Services, Inc., 19 B.R. 802, 803 (Bankr.W.D.Wash. 1982).' " Id. at 925–926.

The crux of the objecting creditor's argument therefore turns on the contention that COD operations do not constitute sufficient working capital, either under the agreement or the feasibility test.

■ First, there is a serious question whether the Debtor is in fact in breach of the franchise agreement. It is noteworthy that pre-petition, Yamaha never sent any default or termination notices to the Debt-

or. And while Yamaha correctly states it was enjoined from invoking termination proceedings against the Debtor under Montana law by reason of the automatic stay (§ 362), it has not moved the Court for relief from the stay. Second, even Yamaha does not expect its dealers to live up to every term of the contract. On direct examination of the Senior District Manager of Yamaha, the following was developed by Yamaha's counsel:

"Q. Mr. Baldwin, the contracts provide that the dealer has to have one of every model available. Do you really expect anybody to live up to that, or this dealer in particular?

A. In our area, there are certain models that are extremely good sellers and there are other models that virtually do not sell, so no, I don't feel that.

The Court: You don't think that the terms of the contract should be followed?

The Witness: In that particular case, I don't feel that." Tr. 69.

Third, the same District Manager said that if this Debtor will stock products and will represent Yamaha he has no problem with this Debtor continuing in the future. Admittedly, the Branch Manager tied his response to the Debtor having a source of available credit, namely, wholesale credit line. Contrary to Yamaha's and ITT's belief, the Debtor, now on a COD basis because of termination of the credit line by ITT, testified that it can survive on a COD basis without a line of flooring credit, and has done so since August 8, 1986. At the time of the hearing, the Debtor had 15 1987 Yamaha models in inventory, together with over 100 carryovers. Moreover, 1987 models are available to the Debtor from other dealers or sources. One must remember that it was the slowdown in the economy which caused the Debtor's financial dilemma leading to this Chapter 11 filing. Once again the Yamaha Senior District Manager buttressed such fact when he conceded the sales of motorcycles are down everywhere,

and in Montana by as much as 27%. Yet, the Debtor still ranks third in sales of all Yamaha products out of 27 dealers in Debtor's service area. I find that is a good track record, particularly when one considers that nationwide Yamaha's share of the snowmobile market is 27%, while in Montana it is 60%. Perhaps more agressive sales effort is due in other regions of the country by Yamaha. Fourth, the Debtor needs the existing three franchises (Yamaha, Suzuki and BMW) to exist. In that regard, I quote from *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir.1984):

"Under Section 365(a), Debtors may still elect to assume the contract. If debtors ultimately determine to assume it, they must cure the default at any time prior to the assumption, pursuant to section 365(b)(1)(A).

Finally, the purposes behind Chapter 11 is 'to permit successful rehabilitation of debtors' and 'to prevent a debtor from going into liquidation'. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984)."

The Debtor believes the sectors of the economy that affected its business downturn have bottomed out, and the present indication is that there will be an upturn in the agriculture and oil industry within the next two years. Therefore, it is good business judgment for Debtor to assume all executory contracts in order to realize greater profit, so as to make payments under the Plan and remain in business. Fifth, although not controlling to this decision, under Section 365(b)(2)(A), the *ipso facto* clause, breaches of the contract dealing with lack of flooring credit, relates directly to the insolvency of the Debtor. Yamaha and ITT stress that lack of such credit will doom this business over the long run. Under the *ipso facto* clause, however, such financial provision does not need cure, or adequate assurance of future performance since it is directly related to insolvency, or the financial condition of the Debtor.[2] ITT contributed to the Debtor's dilem-

---

2. Section 365(b)(2)(A) reads:

"Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

ma when it terminated the wholesale floor line. Under such situation, I find it puzzling that ITT now vigorously joins Yamaha in its argument.

Finally, I conclude there is no default to cure. All sums due Yamaha under the contract are current. All parts are paid COD and other credit for merchandise is set off through warranty reimbursement due the Debtor from Yamaha. ¶ 5.05, requires the dealer shall maintain for its operation adequate working capital and lines of wholesale credit. Therein lies the heart of the dispute. ITT representatives testified that before the Debtor breached the ITT agreement on wholesale financing, ITT had established a line of credit of $500,000.00 for Yamaha products and $100,000.00 to $150,000.00 for Suzuki merchandise. The Debtor may, but does not yet have, an established line of credit with another source, namely, Yellowstone Bank, upon confirmation of the Plan. ITT says that line of credit for Yamaha should be $164,000.00 in order to maintain 1986 sales level. Yet the stock of present Yamaha products of over 115 models is presently being carried by the Debtor, and Yamaha's witness agreed with the Debtor that Debtor could remain competitive by buying on COD for some time. In that regard ITT's witness stated:

"Q. Mr. Musser, just one question. I take it from your testimony that there's no intention in Yamaha, that you know of, to cut off the product to this particular dealer?

A. To cut off the purchase of product?

Q. Yes.

A. Not if we were paid for it." Tr. 64.

So it really makes no difference to Yamaha if it's paid COD or from a wholesale credit line. *In re Bon Ton Restaurant & Pastry Shop*, 53 B.R. 789, 793 (Bankr.N.D.Ill. 1985), holds:

"If the lease [executory contract] is not in default, the Debtor is entitled as a matter of course to the necessary court approval, *In re Sapolin Paints, Inc.*, 20 B.R. 497, 508 (Bnkr.S.D.N.Y.1982), to assume an unexpired lease which appears to be in the best interest of the estate, *In re Lionel Corp.*, 29 B.R. [694] at 696 [Bankr.S.D.N.Y.1983], and under which the Debtor is able to perform. *In re Coast Trading Co., Inc.*, 26 B.R. 737, 741 (Bankr.D.Or.1982). The requirement of court approval in the form of an express order, *e.g. Matter of Whitcomb & Keller Mortg. Co., Inc.*, 715 F.2d 375, 380 (7th Cir.1983), furthers the policy underlying the Bankruptcy Code 'of maximizing the value of the estate for the benefit of all creditors, while preserving certain rights to contracts with the debtor.' *In re Kelly Lyn Franchise Co., Inc.*, 26 B.R. 441, 445 (Bankr.M.D.Tenn.1983)."

See also, *In re Offices & Serv. of White Plains Plaza, Inc.*, 56 B.R. 607, 610 (Bankr.S.D.N.Y.1986); *In re Westview 74th Street Drug Corp.*, 59 B.R. 747, 754 (Bankr.S.D.N.Y.1986).

I conclude, therefore, that the Debtor has shown to the satisfaction of the Court by clear and convincing evidence that its assumption of the three executory contracts is a good business decision. Even if the Yamaha agreement can be held to be in default, I conclude that the Debtor's present business operation and financial condition as restructured provides adequate assurance to each franchisor that the Debtor will perform in accordance with the contract. As a practical matter, after con-

(A) The insolvency or financial condition of the debtor at any time before the closing of the case;

(B) The commencement of a case under this title; or

(C) The appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement."

Yamaha stresses that such position is contrary to the holding of *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27 (1st Cir.1984). *Pioneer* has no factual similarity to the case *sub judice* and is largely different because it dealt with 11 U.S.C. 365(c)(1)(A) and (f)(1), an assignment of executory contract under non-bankruptcy law. (Court must look to see whether relevant non-bankruptcy law would allow Ford to veto assignment of its franchise agreement). Moreover, "Congress intended the words "adequate assurance" be given a practical, pragmatic construction, and is to be determined under the facts of each particular case." *In re Bygaph, Inc.*, 56 B.R. 596, 605 (Bankr.S.D. N.Y.1986).

firmation of the Plan, the automatic stay is no longer in effect, and Yamaha, if it feels aggrieved by an alleged breach of the agreement, may commence proceedings under § 61–4–201 et seq., M.C.A., to terminate the dealer relationship with the Debtor. See, *In re Herron,* 60 B.R. 82, 84 (Bankr.W.D.La.1986) and *In re Ernst,* 45 B.R. 700 (Bankr.Minn.1985) (neither § 362 or § 524 injunctions apply post-confirmation, and creditor is entitled to seek state remedies upon default).

■ As noted from *In re Prudential Energy,* supra, most Debtors emerge from reorganization with a significant handicap, and all that is required is that there be a reasonable assurance of commercial viability. In this case, the Debtor has shown without contradiction that its earning power from an excellent business location will be sufficient to pay its creditors under the Plan and will maintain a cash reserve for operating capital. It thus will emerge from reorganization with a continuity of capable management under a more efficient operation. Given improved economic conditions, it should have sufficient capital from its operation to remain viable. In sum, I conclude from the evidence that there is reasonable assurance of commercial viability. Strong creditor support from the ballots filed in this cause buttresses that conclusion. As I stated in *In re Martin,* supra, at 931:

> "The duty of this court, being one primarily of equity, is to protect all creditors' interests, expecially those who do not have collateral adequate to protect repayment of debt, as long as the Code requirements are satisfied by the Plan, which is true in this case. Express Congressional policy in favor of rehabilitation, with attendant protection of secured creditors' interest and bargain, lead this Court to conclude the debtors' plan of reorganization as a going concern satisfies the letter and spirit of the Bankruptcy Code."

I conclude after notice and hearing:

1. That the Plan complies with the applicable provisions of Chapter 11 of the Code.

2. That the proponents of the Plan comply with the applicable provisions of the Code;

3. That the Plan has been proposed in good faith and not by any means forbidden by law;

4. (A) That any payments made or promised by the Debtor for services or costs and expenses in connection with the case, or in connection with the Plan and incident to the case, have been disclosed to the court;

(B) Any such payment made before confirmation is reasonable;

5. (A) Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, and appointment to or continuance in such office of such individual, is consistent with the interest of creditors and equity security holders and with public policy;

(B) That Debtor's Plan discloses the identity of any insider that will be employed or retained by the reorganized Debtor and the nature of cooperation of such insider;

6. With respect to each class:

(A) Each holder of a claim or interest of such class has accepted the Plan or will receive or retain under the Plan an account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7; or

(B) Under Section 1129(b)(2) of the Code, each holder of a claim of such class will receive or retain under the Plan an account of such claim property of a value as of the effective date of the Plan, that is not less than the value of such creditor's interest in the estate's interest in the property that secures such claims;

7. With respect to each class, such class has accepted the Plan or the Plan provides that:

(A) With respect to a claim of a kind specified in Sections 507(a)(1) or 507(a)(2) of the Code, on the effective date of the Plan,

the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim.

(B) With respect to a class of claims of a kind specified in sections 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Code, each holder of a claim of such class will receive, if such class has accepted the Plan, deferred cash payments of value, as of the effective date of the Plan, equal to the allowed amount of such claim; or, if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claim; or

(C) With respect to a claim of the kind in Section 507(a)(7) of the Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding 6 years after the date of assessment of such claim, of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(D) With respect to each class of secured creditors who are impaired under the Plan and have not accepted the Plan, the Plan does not discriminate unfairly and is fair and equitable with respect to each class and the Plan complies with Section 1129(b)(2)(A) of the Code;

8. At least one class of claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding a claim of such class;

9. No regulatory commission with jurisdiction is involved in the Plan.

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor debtor under the Plan, unless such liquidation is proposed in the Plan.

IT IS ORDERED Debtor's Chapter 11 Plan of Reorganization is confirmed.